## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

DEEANN THORNE, *on behalf of herself and all others similarly situated*

*Plaintiff,*

v.

SQUARE, INC. and SUTTON BANK,

*Defendants.*

## CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Deeann Thorne, Plaintiff herein, by her attorneys, brings the following Class Action Complaint on behalf of herself and all others similarly situated and alleges and complains of Defendants as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff is a victim of electronic fraud.

2.      The perpetrator, who is unknown to Plaintiff, fraudulently misrepresented themselves online in a successful effort to obtain Plaintiff's Cash App payment information which they used to charge and withdraw roughly $3,000.00 from Plaintiff's account.

3.      Plaintiff disputed the charges with Defendants Square, Inc. and, through Square, Inc., with Defendant Sutton Bank.

4.      Defendants' error resolution procedures violate the Electronic Funds Transfer Act's dispute process provisions in a variety of ways.

5.      First, Defendants unlawfully require a host of information to be provided as a condition precedent of opening or investigating a dispute or resolving a dispute in a consumer's

1

favor. The EFTA requires that a bona fide investigation be conducted once a bare minimum of information is provided by the consumer.

6.      Second, Defendants' error resolution process violates the EFTA by explicitly placing the burden of proving the unauthorized transfer on the consumer (and denying disputes on grounds that the consumer has not met his or her burden of proving that the transaction was unauthorized).  The EFTA requires the opposite, providing that Defendants are liable for allegedly unauthorized disputes where Defendants cannot show that the transaction was in fact authorized.

7.      Third, Defendants' error resolution process also violates the EFTA because Defendants deny claims without providing any explanation or providing to the consumer the documents Defendants reviewed during the investigation.  Both an explanation of the denial and a notice of the right to request these materials are required under the statute.

8.      Plaintiff brings claims against Defendants for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, and New York General Business Practice § 349 ("NYGBL § 349").

## JURISDICTION AND VENUE

9.      The Court has jurisdiction pursuant to 15 U.S.C. § 1693m and 28 U.S.C. § 1331.

10.     The Court also has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because it is brought as a class action, on behalf of a Class of over 100 Class Members, whose claims aggregate in excess of $5 million, and which includes members whose state citizenship is diverse from that of Defendants.

11.     Jurisdiction over Plaintiff's claim for declaratory relief is conferred by 28 U.S.C. § 2201.

12.     Supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District because a substantial part of the events and occurrences underlying this litigation occurred within this District, and Defendants regularly conduct business here.

## PARTIES

14.     Plaintiff is a natural person and citizen of New York residing in Brooklyn, NY.

15.     Plaintiff is a "consumer" as defined by the EFTA, 15 U.S.C. § 1693a(6). The accounts at issue were used for personal, family, or household purposes.

16.     Defendant Sutton Bank is a state chartered banking association and is chartered and located in Ohio.

17.     Defendant Sutton Bank was, at all times relevant to this Complaint, a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9).

18.     Defendant Square, Inc. is an American financial services, merchant services aggregator, and mobile payment company.

19.     Defendant Square, Inc. is a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9) in its own right and/or as the agent of Defendant Sutton Bank.

## FACTS

20.     Cash App is a popular mobile payment software application offered by Defendant Square, that facilitates sending and receiving money.

21.     Many Cash App users fund their purchases out of a prepaid debit card that is offered by Square and its partner, Defendant Sutton Bank.  Square refers to the card as the Cash Card.

22.     "Sutton Bank is the issuer of the Square Prepaid debit card which acts as an access device to funds held within the Square Cash App, maintained by Square INC."

https://www.suttonbank.com/services-tools/tools/prepaid-card-support.html.

23.     There are approximately 30 million active Cash App users, and approximately 7 million of them have a Cash Card. See, e.g.https://www.businessinsider.com/square-cash-app-fueled-q2-performance-2020-

8#:~:text=Square%20revealed%20that%20its%20peer,over%2Dyear%20(YoY).

24.     Square's total revenue from the Cash App subscriptions and services, including the Cash Card, was over $ 1.1 billion in 2019.

25.     Square and Sutton have arranged for Square to control central and basic aspects of the Cash Card, including all consumer-facing functions.

26.     When a consumer using the Cash Card account via Cash App is defrauded or otherwise disputes a transaction, it is Square that handles the dispute process.

https://www.suttonbank.com/services-tools/tools/prepaid-card-support.html.

27.     Customers are directed by Sutton to contact Square Cash if their card has been lost or stolen or if someone has transferred or may transfer funds from their Card Account without their permission. *Id*

28.     Indeed, Sutton Bank refers Cash Card users to Square for all customer service, account, IT, fraud, and technical issues.  *Id*.

29.     And according to Sutton Bank's website, Cash App transaction history and bank statements are available through the Cash App and not Sutton Bank.  Id.

30.     At no time during the dispute process does Square direct consumers to Sutton Bank or to any alternative dispute process available through Sutton Bank.

31.     At all relevant times, Plaintiff maintained (and has continued to maintain) a Cash App account and a Cash Card.

32.     As Defendants are well aware, fraudulent scams in which criminals pose as legitimate sellers and/or cash app representatives are extraordinarily common on Cash App. *See, e.g.* https://www.suttonbank.com/services-tools/tools/prepaid-card-support.html; https://www.nytimes.com/2020/10/11/technology/fraud-payment-apps.html; https://myfox8.com/news/cash-app-scam-could-wipe-out-your-bank-account/; https://www.consumer.ftc.gov/articles/mobile-payment-apps-how-avoid-scam-when-you-use-one; https://www.azfamily.com/news/investigations/3_on_your_side/cash-app-scam-leaves-valley-woman-homeless/article_7d9611d4-0983-11eb-bb6a-e372e209486e.html

33.     Plaintiff is the victim of one such Cash App scam.

34.     Specifically, on July 3, 2020 Plaintiff used her Cash App mobile payment account, funded by her Cash Card account, to purchase a dress from Shane Justin Collections, which is a tradename used by DareToBeVintage, LLC.

35.     Shane Justin Collections is a known women's clothing boutique.

36.     To make her purchase, Plaintiff attempted to visit Shane Justin Collection on Instagram, an online social media site.

37.     To this end, Plaintiff visited an online store on Instagram called "@shanejustincollections".

38.     "@shanejustincollections" turned out to be a fraudulent Instagram page constructed to deceive shoppers into believing they were buying from the real Shane Justin Collections.

39.     Plaintiff, believing she was purchasing the goods shown on her screen, paid the fraudulent online store $120.00 for a dress.

40.     The 'store' then responded to her that they were experiencing technical difficulties with Cash App and asked Plaintiff if they could 'request' the funds from her account.

41.     Plaintiff agreed and the fraudulent online store then promptly withdrew roughly $3,000.00 from Plaintiff's Cash App/Cash Card account.

42.     Plaintiff disputed the transaction with Defendants immediately, that same day, by initiating a complaint through Cash App.

43.     Defendants responded via a form, boilerplate text message, which was a standardized communication routinely used by Defendants when dealing with consumer disputes.

44.     Defendants stated that "to open a Cash Card dispute," Plaintiff was required to provide a laundry list of "required information" and stating that "once you provide the required information in its entirety, we can open a dispute claim."

45.     Specifically, Defendants sent the following communication:



All Inboxes **Suspicious Transaction**

Hello Deedee,

To file a Cash Card dispute, we need to gather the required additional information.

A failure to provide this information in its entirety may affect the outcome of your claim.

- Merchant/Recipient Name:
- Transaction Date:
- Transaction Amount:
- Dispute Reason:
    1. Services Not Provided / Merchandise Not Received
    2. Cancelled Recurring Payment
    3. Fraud / No Knowledge
    4. Duplicate Transaction
    5. Incorrect Transaction Amount (attach receipt)
    6. Merchant Credit Not Received (attach receipt)
    7. Paid by Other Means (attach receipt)
- Dates you contacted the Merchant/ Recipient:
- Merchant/Recipients' response and resolution:





**‹ All Inboxes** **Suspicious Transaction**

- Contact Method (email, phone number, or social media):

Once you provide the required information in its entirety, we can open a dispute claim.

If the transaction was unauthorized, please order a new Cash card to prevent further transactions:

1. Tap the Cash Card tab on your Cash App home screen
2. Tap the image of your Cash Card
3. Tap Report Card Lost or Stolen
4. Tap Card Stolen
5. Confirm your mailing address and tap Next
6. Enter your PIN to confirm and follow the prompts to complete your order

If the transaction in question was an authorized peer-to-peer payment, we are unable to file a dispute or refund the payment. You will need to resolve this issue with the recipient directly.

Cash App Support
ref:_00DE0Y7ru._5004W1UqnKe:ref



8

46.     Plaintiff immediately provided the requested information via text message.

47.     Defendants responded with a form response from "Ella with the Cash Support team" that same day that thanked Plaintiff for the information provided and demanded still more information (this time regarding the security settings on her phone, whether anyone else had access to her device, etc., and stating that Cash App could not investigate or review her claim unless this additional information was provided).

48.     Specifically, the form follow-up text stated:



Hi Cherryann,

My name is Ella with the Cash Support team. I apologize for our delay in getting back to you, I understand that seeing a payment in your account that you don't recognize could be a frustrating situation and I want to help you the best way I can.

I thank you for the information you already sent us, but before we can investigate this unauthorized payment, please provide the following details within the next 7 business days. This will help us determine the best course of action.

1. How many devices have you used to access your Cash App?

  ○ Provide the make and model of each device:

2. Respond "yes" or "no" if you had the following security features enabled on your mobile device or Cash App at the time of the transaction:





- Passcode or Touch ID to authorize Cash payments:
- Push Notifications for Cash App payments:
- An enabled security lock such as a passcode or Touch ID:

3. Does anyone other than you have access to your device?

- Have you contacted them about these transactions?

4. For each unauthorized transaction, provide:

- Date:
- Payment amount:
- Recipient name or $Cashtag:

We will review your claim as soon as we receive this information.

Thank you for your help! In the meantime, feel free to contact me if any other questions or concerns come up. I want to make sure we get everything taken care of.



49.     Plaintiff responded on July 6, 2020 by reiterating that she was the victim of fraud, stating:

> $custom60 Scammed me out of $3,000 on
> Friday July 3,2020 in the evening. This was
> fraud and I want my money back to me. I had no
> knowledge. This is one of his 7 illegal
> transactions. He took $1,400, $720, $240
> twice, $120 three times all back to back.
>
> ref:_00DE0Y7ru._5004W1UqnKe:ref

50.     Defendant Square responded on July 9, 2020 ("the Non-Reasoned Denial"), denying the claim with a form response that did not state a reason or disclose Plaintiff's right to copies of the documents used during the investigation, stating:

Hi Cherryann,

This is Ella with Cash Support again, thank you for your reply.

I'm sorry to tell you that Cash App is unable to cancel or refund this payment. Please resolve this issue with the recipient directly.

Before sending a payment, we recommend that you:

- Only send funds to people you know
- Verify the recipient's name before sending funds
- Double-check the spelling of $Cashtags
- Double-check the recipient's phone number

I would really like to further assist you with this claim. However, no more information can be advanced. If anything else comes up, please don't hesitate to reach back to us.

Warm regards,

51.     On July 9, 2020, Plaintiff provided Defendants with all of the additional information requested on July 6, 2020 (confirming, inter alia, that she had security features activated and that no one else had access to the device).

52.     Defendants responded on July 10, 2020, with a form denial of claim which stated, *inter alia*, that "we do not have enough evidence to determine the activity was unauthorized and have denied your claim" (the "Burden-Is-On-The-Consumer Form Denial").  Specifically, its form response read as follows:



**•ıl T-Mobile LTE**     11:34 AM     **▮ 7% ⬛**
9 Messages
**‹ All Inboxes Suspicious Transaction**    ∧ ∨

We compared the transaction you brought to our attention with your account history. We determined that we received the transaction in question from a known device. This device had accessed your Cash App account prior to this event.

Based on this information, we do not have enough evidence to determine the activity was unauthorized and have denied your claim. This concludes our investigation into this claim.

We recommend speaking with anyone who had access to your device at the time of the transaction. If your phone was lost/stolen during the time of the transaction and you wish to file a police report, Square will cooperate in their investigation.

You can also share the following contact information below with law enforcement if you choose to file a report:

Square, Inc.
Attn: Compliance Department



53.     The Burden-Is-On-The-Consumer Form Denial does not provide a legitimate reason for denying the dispute and does not provide notice of Plaintiff's right to investigatory materials.

54.     Defendants have thus refused to refund Plaintiff the $3,000 that was drained from her account as a result of fraud.

55.     Given the wide spread use of Cash App and the Cash Card, and the ever growing prevalence of fraudulent schemes occurring on this platform, the pattern and practice of unlawful conduct set forth herein--which involves improper dispute processing via means of common policies and automated, boilerplate communications impacts thousands, and potentially millions, of consumers.

## CLASS ALLEGATIONS

56.     Plaintiff brings this claim on behalf of herself, and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

57.     Plaintiff seeks to represent a nationwide EFTA Class and a New York State GBL 349 Class (collectively, "the Classes").

58.     The EFTA Class is defined as all persons in the United States who:

   **a.**  have or had an account with Cash App within one year prior to filing of this action; and

   **b.**  who have a Cash Card or other similar card offered to Cash App customers by Defendants (or who had such a card within one year prior to filing of this action); and

   **c.**  who filed a dispute regarding an allegedly unauthorized transfer in the past year; and

    **d.** who were (i) sent in response one or more communications that required that the person provide dispute information beyond the dispute information explicitly referenced in 15 U.S.C. Sec. 1693f(a) as a condition of accepting, opening, investigating or successfully resolving the dispute in the consumer's favor; or (ii) whose dispute was denied based on the stated grounds that Defendants did not have enough information or evidence to determine that the activity was unauthorized; or (iii) whose dispute denial failed to include an explanation and/or a notice regarding the consumer's right to documents used during the investigation.

59.    The New York GBL 349 Class is defined as all persons in New York State who:

    **a.** have or had an account with Cash App within one year prior to filing of this action; and

    **b.** who have a Cash Card or other similar card offered to Cash App customers by these two Defendants (or who had such a card within one year prior to filing of this action); and

    **c.** who filed a dispute regarding an allegedly unauthorized transfer in the past three years; and

    **d.** who were (i) sent in response one or more communications that required that the person provide dispute information beyond the dispute information explicitly referenced in 15 U.S.C. Sec. 1693f(a) as a condition of accepting, opening, investigating or successfully resolving the dispute in the consumer's favor; or (ii) whose dispute was denied based on the stated grounds that Defendants did not have enough information or evidence to determine that the activity was

unauthorized; or (iii) whose dispute denial failed to include an explanation and/or a notice regarding the consumer's right to documents used during the investigation.

60.     Excluded from the Classes is anyone employed by counsel for Plaintiff in this action and any Judge to whom this case is assigned, as well as his or her immediate family and staff.

*Numerosity*

61.     As set forth above, there are millions of people who use both Cash App and the Cash Card.

62.     As set forth above, fraud on Cash App, including with regard to consumers that fund their purchases via a Cash Card, is prevalent and growing.

63.     As set forth above, when responding to these disputes Defendants use standardized communications that Plaintiff alleges violate the law.

64.     These standardized communications reflect generalized policies and procedures that Plaintiff alleges violate the law.

65.     Thus, there are undoubtedly many thousands of customers that have already been victims of Defendants' unlawful communications, policies and practices.

66.     And there are millions of consumers that will be subject to these unlawful communications, policies and practices in the future.

67.     As such, the Classes are sufficiently numerous that joinder of all members is impracticable.

68.     Although the exact number of members of the Classes and their addresses are unknown to Plaintiff, they are readily ascertainable from Defendants' records.

*Existence and Predominance of Common Questions*

69.     Common questions of law and fact exist as to Plaintiff and all members of the

Classes and predominate over questions affecting only individual members of the Classes.

70.     These common questions include:

a.   Whether the requirements that Defendants impose upon consumers wishing to

dispute a transaction as a condition of accepting, opening, investigating or

successfully resolving the dispute in the consumer's favor are unlawful under the

EFTA and/or New York law.

b.   Whether Defendants' denial of disputes on the stated grounds that Defendants do

not have enough information or evidence to determine that the activity was

unauthorized is unlawful under the EFTA and/or New York law.

c.   Whether Defendants' denial of disputes without providing an explanation and/or

the statutorily required notice regarding the consumer's right to investigatory

documents is unlawful under the EFTA and/or New York law.

*Typicality*

71.     Plaintiff's claims are typical of the claims of the Classes because Plaintiff is a

member of the Classes and is subject to the same unlawful conduct as other members of the

Classes.

72.     Thus, Plaintiff's claims—based on the same facts and legal theories as the claims of

all other members of the Classes—are typical of the claims of the Classes.

*Adequacy*

73.     Plaintiff will fairly and adequately represent the interests of the members of the Classes. Her interests do not conflict with the interests of the members of the Classes they seek to represent.

74.     Plaintiff has retained counsel experienced in prosecuting class actions and in consumer protection matters. There is no reason why Plaintiff and her counsel will not vigorously pursue this matter.

*Superiority*

75.     A class action is superior to other available means for the fair and efficient adjudication of the claims at issue.

76.     The damages suffered by each individual member of the Classes may be limited. Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

77.     Further, it would be virtually impossible for each individual member of the Classes to redress the wrongs done to them. Even if the members of the Classes themselves could afford such individual litigation, the court system could not.

78.     Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.

79.     By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

80.     In the alternative, the Classes may be certified because:

a.  the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants;

b.  the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other  members of the Classes not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

c.  Square, Inc. and Sutton Bank has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

**FIRST CLAIM FOR RELIEF**
**(Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq.*)**

81.    Plaintiff repeats and re-alleges each of the foregoing paragraphs of this Complaint as if fully set forth herein.

82.    The EFTA places sharp limitations on consumer liability for unauthorized transactions.  For example, "If the consumer notifies the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.".  12 CFR Sec. 1005.6 ("Liability of consumer for unauthorized transfers").  See, 15 U.S. Code § 1693g ("Consumer liability").

83.     Pursuant to the EFTA, 15 U.S.C. Sec. 1693f(a), Defendants must conduct an

investigation of an authorized transaction once the consumer provides a minimum of

information.

84.     Specifically, the statute provides in relevant part that:

> [O]nce the consumer provides oral or written notice in which the consumer --
>
> **(1)** sets forth or otherwise enables the  to identify the name
> and account number of the consumer;
>
> **(2)** indicates the consumer's belief that the documentation, or, . . .
> the consumer's account, contains an error and the amount of such error; and
>
> **(3)** sets forth the reasons for the consumer's belief (where applicable) that
> an error has occurred,
>
> the financial institution shall investigate the alleged error, determine
> whether an error has occurred, and report or mail the results of such
> investigation and determination to the consumer within ten business days.
> Thus, once the account holder provides (1) the name and account number
> of the consumer; (2) indicates a belief that there is an error and (3) sets
> forth the reasons for the belief that there is an error, Defendants must
> ("shall") investigate.

15 U.S.C. Sec. 1693f –Error Resolution.

85.     The EFTA, Section 1693(f) defines "errors" broadly:

> (f)  ACTS CONSTITUTING ERROR.--For the purpose of this section, an
> error consists of--
> (1)  an unauthorized electronic fund transfer;
> (2)  an incorrect electronic fund transfer from or to the consumer's account;
> (3)  the omission from a periodic statement of an electronic fund transfer
> affecting the consumer's account which should have been included;
> (4)  a computational error by the financial institution;
> (5)  the consumer's receipt of an incorrect amount of money from an
> electronic terminal;
> (6)  a consumer's request for additional information or clarification
> concerning an electronic fund transfer or any documentation required by
> this title; or
> (7)  any other error described in regulations of the Bureau.

See also, Regulation E, 12 C.F.R. § 1005.33 ("Procedures for resolving errors"); Official
Interpretation of Regulation E, 11(b)(1) ("Notice of Error From Sender").

86.     Where a Defendant determines after its investigation that no error has occurred it must provide an explanation and inform the consumer of certain rights.

87.     Specifically, 15 U.S.C. Sec. 1693f states in relevant part:

> (d)Absence of error; finding; explanation
>
> If the financial institution determines after its investigation pursuant to subsection (a) or (c) that an error did not occur, it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur. The financial institution shall include notice of the right to request reproductions with the explanation of its findings.

88.     Here, Defendants clearly violate these provisions by regularly, routinely and explicitly requiring far more information as a condition of opening, investigating and/or favorably resolving account holder's disputes than the very limited information required by Section 1693f.

89.     And as set forth above, even when a consumer provides this information, Defendants' standard response requires still more information,

90.     When a consumer does not provide this additional information, the dispute is summarily rejected without the explanation and disclosure of the right to investigation materials required under 1693f(d).

91.     And even where a consumer does provide this additional information, his or her dispute is subject to rejection due to Defendants' unlawful imposition upon the accountholder of the burden of proof.

92.     Specifically, pursuant to Section 1693g(b), it is Defendants' burden to prove that the disputed transfer was authorized:

(b)  BURDEN OF PROOF.--In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met, and, if the transfer was initiated after the effective date of section 905, that the disclosures required to be made to the consumer under section 905(a)(1) and (2) were in fact made in accordance with such section.

93.     However, Defendants are explicit in their reversal of that burden, regularly denying claims on grounds that they "we do not have enough evidence to determine the activity was unauthorized".

94.     Moreover, the EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. § 1693g(b).

95.     Accountholders' rights under the EFTA are non-waivable.  Specifically, 15 U.S. Code § 1693l (Waiver of rights") states in relevant part that "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter."

96.     On information and belief, Defendants' routine violation of the EFTA's error resolution provisions is based in part on its incorrect belief that consumers must indemnify Square for unauthorized transfers, *i.e.* for "(f) any other party's access and/or use of the Services with your unique name, password orother appropriate security code."  Square General Terms of Service at ¶ 15.

97.     Defendants acts and omissions set forth above constitute violations of the EFTA.

98.     As a direct and proximate result of Defendants' violations of the EFTA, Plaintiff is entitled to an award of statutory and actual damages as well as attorney's fees and costs.

99.     Defendants' routine refusal to accept, open, investigate or resolve disputes in the consumer's favor and its imposition of the burden of proof on the consumer contrary to statute constitutes a violation of 1693f(e), entitling Plaintiff (and each member of the class) to treble damages.

## SECOND CLAIM FOR RELIEF
### (Deceptive Acts and Practices Unlawful, NYGBL § 349 *et seq.*)

100.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

101.     In the course of its dealings with Plaintiff, Defendants have engaged in deceptive conduct in the conduct of business, trade, commerce or the furnishing of a service in this state and constituted a violation of §349 independent of whether Defendants' conduct violated any other law.

102.     Defendants' deceptive conduct included, without limitation, denying dispute claims for unlawful reasons while deceptively stating or inferring that these reasons were proper.

103.     Defendants' conduct as alleged herein is "consumer oriented."

104.     Indeed, far from a "one shot transaction," Defendants engage in the allegedly unlawful conduct on a routine basis with many thousands of consumers using standardized polices, procedures and form/boilerplate communications.

105.     Defendants' misconduct as set forth above is thus part of a recurring policy and practice.

106.     Each of these deceptive acts and practices is one that has a broad impact on consumers.

107.     Due to these violations of NYGBL § 349, Plaintiff has suffered actual damages and is entitled to:

- actual damages;

- treble damages;

- punitive damages;

- declaratory judgment that Defendants have violated the statute;

- injunctive relief barring Defendants from henceforth committing the deceptive acts and practices set forth herein;

- costs; and

- reasonable attorney's fees.

**WHEREFORE,** Plaintiff seeks judgment in her favor and damages against Defendants:

A.   An order certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiff as Class Representative, and appointing his attorneys as Class Counsel;

B.   An award of actual damages, treble damages, statutory damages, punitive damages, attorney's fees and costs; and

C.   such other and further relief as may be necessary, just, and proper.

*[continued on next page]*

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: October 23, 2020

*/s/ Daniel A. Schlanger*
Daniel A. Schlanger
Schlanger Law Group LLP
80 Broad Street, Suite 1301
New York, NY 10004
T: 212-500-6114
F: 646-612-7996
E: dschlanger@consumerprotection.net


*/s/Beth E. Terrell*
Terrell Marshall Law Group, PLLC
Beth E. Terrell (to move for admission pro hac vice)
Email: bterrell@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 319-5450


*Counsel for Plaintiff and the Putative Class*