# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEEANN THORNE, FLOR ALONZO, ROBIN CLEMENTS, and DEMETRIUS LOVETT *on behalf of themselves and all others similarly situated*,<br><br>*Plaintiff,*<br><br>v.<br><br>SQUARE, INC. and SUTTON BANK,<br><br>*Defendants.* | NO. 1:20-cv-05119-NGG-RML<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Deeann Thorne, Flor Alonzo, Robin Clements, and Demetrius Lovett, Plaintiffs herein, by their attorneys, bring the following Class Action Complaint on behalf of themselves and all others similarly situated and allege and complain of Defendants as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs are victims of electronic fraud.

2.      The perpetrators, who are unknown to Plaintiffs, fraudulently misrepresented themselves online in a successful effort to obtain Plaintiffs' Cash App payment information which they used to charge and withdraw thousands of dollars from Plaintiffs' accounts.

3.      Plaintiffs disputed the charges with Defendant Square, Inc. and, through Square, Inc., with Defendant Sutton Bank.

4.      Defendants' error resolution procedures violate the Electronic Funds Transfer Act's dispute process provisions in a variety of ways.

5.      First, Defendants unlawfully require a host of information to be provided as a condition precedent of opening or investigating a dispute or resolving a dispute in a consumer's

1

favor. The EFTA requires that a bona fide investigation be conducted once a bare minimum of information is provided by the consumer.

6. Second, Defendants' error resolution process violates the EFTA by explicitly placing the burden of proving the unauthorized transfer on the consumer (and denying disputes on grounds that the consumer has not met his or her burden of proving that the transaction was unauthorized). The EFTA requires the opposite, providing that Defendants are liable for allegedly unauthorized disputes where Defendants cannot show that the transaction was in fact authorized.

7. Third, Defendants' error resolution process also violates the EFTA because Defendants deny claims without providing any explanation or providing to the consumer the documents Defendants reviewed during the investigation. Both an explanation of the denial and a notice of the right to request these materials are required under the statute.

8. Plaintiffs bring claims against Defendants for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, and New York General Business Practice § 349 ("NYGBL § 349").

## JURISDICTION AND VENUE

9. The Court has jurisdiction pursuant to 15 U.S.C. § 1693m and 28 U.S.C. § 1331.

10. The Court also has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because it is brought as a class action, on behalf of a Class of over 100 Class Members, whose claims aggregate in excess of $5 million, and which includes members whose state citizenship is diverse from that of Defendants.

11. Jurisdiction over Plaintiffs' claim for declaratory relief is conferred by 28 U.S.C. § 2201.

12.     Supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District because a substantial part of the events and occurrences underlying this litigation occurred within this District, and Defendants regularly conduct business here.

**PARTIES**

14.     Plaintiff Deeann Thorne is a natural person and citizen of New York residing in Brooklyn, NY.

15.     Plaintiff Flor Alonzo is a natural person and citizen of New York residing in Brooklyn, NY.

16.     Plaintiff Robin Clements is a natural person and citizen of Massachusetts residing in Lynn, MA.

17.     Plaintiff Demetrius Lovett is a natural person and citizen of Texas residing in Universal City, TX.

18.     Plaintiffs are "consumers" as defined by the EFTA, 15 U.S.C. § 1693a(6). The accounts at issue were used for personal, family, or household purposes.

19.     Defendant Sutton Bank is a state chartered banking association and is chartered and located in Ohio.

20.     Defendant Sutton Bank was, at all times relevant to this Complaint, a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9).

21.     Defendant Square, Inc. is an American financial services, merchant services aggregator, and mobile payment company.

22.     Defendant Square, Inc. is a financial institution as defined by the EFTA, 15 U.S.C. § 1693a(9) in its own right and/or as the agent of Defendant Sutton Bank.

## FACTS

23.     Cash App is a popular mobile payment software application offered by Defendant Square, that facilitates sending and receiving money.

24.     Many Cash App users fund their purchases out of a prepaid debit card that is offered by Square and its partner, Defendant Sutton Bank. Square refers to the card as the Cash Card.

25.     "Sutton Bank is the issuer of the Square Prepaid debit card which acts as an access device to funds held within the Square Cash App, maintained by Square INC."
https://www.suttonbank.com/services-tools/tools/prepaid-card-support.html.

26.     There are approximately 30 million active Cash App users, and approximately 7 million of them have a Cash Card. *See, e.g.*, https://www.businessinsider.com/square-cash-app-fueled-q2-performance-2020-8#:~:text=Square%20revealed%20that%20its%20peer,over%2Dyear%20(YoY).

27.     Square's total revenue from the Cash App subscriptions and services, including the Cash Card, was over $ 1.1 billion in 2019.

28.     Square and Sutton have arranged for Square to control central and basic aspects of the Cash Card, including all consumer-facing functions.

29.     When a consumer using the Cash Card account via Cash App is defrauded or otherwise disputes a transaction, it is Square that handles the dispute process.
https://www.suttonbank.com/services-tools/tools/prepaid-card-support.html.

30.     Customers are directed by Sutton to contact Square if their card has been lost or stolen or if someone has transferred or may transfer funds from their Card Account without their permission. *Id*

31.     Indeed, Sutton Bank refers Cash Card users to Square for all customer service, account, IT, fraud, and technical issues. *Id*.

32.     And according to Sutton Bank's website, Cash App transaction history and bank statements are available through the Cash App and not Sutton Bank. Id.

33.     At no time during the dispute process does Square direct consumers to Sutton Bank or to any alternative dispute process available through Sutton Bank.

34.     At all relevant times, Plaintiffs maintained (and have continued to maintain) a Cash App account and a Cash Card.

35.     As Defendants are well aware, fraudulent scams in which criminals pose as legitimate sellers and/or cash app representatives are extraordinarily common on Cash App. *See, e.g.*, https://www.suttonbank.com/services-tools/tools/prepaid-card-support.html; https://www.nytimes.com/2020/10/11/technology/fraud-payment-apps.html; https://myfox8.com/news/cash-app-scam-could-wipe-out-your-bank-account/; https://www.consumer.ftc.gov/articles/mobile-payment-apps-how-avoid-scam-when-you-use-one; https://www.azfamily.com/news/investigations/3_on_your_side/cash-app-scam-leaves-valley-woman-homeless/article_7d9611d4-0983-11eb-bb6a-e372e209486e.html.

36.     Plaintiffs have all been the victims of just such a Cash App scam.

37.     Plaintiff Thorne. On July 3, 2020 Plaintiff Thorne used her Cash App mobile payment account, funded by her Cash Card account, to purchase a dress from Shane Justin Collections, which is a tradename used by DareToBeVintage, LLC.

38.     Shane Justin Collections is a known women's clothing boutique.

39.     To make her purchase, Ms. Thorne attempted to visit Shane Justin Collection on Instagram, an online social media site.

40.    To this end, Ms. Thorne visited an online store on Instagram called "@shanejustincollections."

41.    The "@shanejustincollections" handle turned out to be a fraudulent Instagram page constructed to deceive shoppers into believing they were buying from the real Shane Justin Collections.

42.    Ms. Thorne, believing she was purchasing the goods shown on her screen, paid the fraudulent online store $120.00 for a dress.

43.    The 'store' then responded to her that they were experiencing technical difficulties with Cash App and asked Ms. Thorne if they could 'request' the funds from her account.

44.    Ms. Thorne agreed and the fraudulent online store then promptly withdrew roughly $3,000.00 from Ms. Thorne's Cash App/Cash Card account.

45.    Ms. Thorne disputed the transaction with Defendants immediately, that same day, by initiating a complaint through Cash App.

46.    Defendants responded via a form, boilerplate text message, which was a standardized communication routinely used by Defendants when dealing with consumer disputes.

47.    Defendants stated that "to open a Cash Card dispute," Ms. Thorne was required to provide a laundry list of "required information" and stating that "once you provide the required information in its entirety, we can open a dispute claim."

48.    Specifically, Defendants sent the following communication:


Hello Deedee,

To file a Cash Card dispute, we need to gather the required additional information.

A failure to provide this information in its entirety may affect the outcome of your claim.

- Merchant/Recipient Name:
- Transaction Date:
- Transaction Amount:
- Dispute Reason:
    1. Services Not Provided / Merchandise Not Received
    2. Cancelled Recurring Payment
    3. Fraud / No Knowledge
    4. Duplicate Transaction
    5. Incorrect Transaction Amount (attach receipt)
    6. Merchant Credit Not Received (attach receipt)
    7. Paid by Other Means (attach receipt)
- Dates you contacted the Merchant/Recipient:
- Merchant/Recipients' response and resolution:




- Contact Method (email, phone number, or social media):

Once you provide the required information in its entirety, we can open a dispute claim.

If the transaction was unauthorized, please order a new Cash card to prevent further transactions:

1. Tap the Cash Card tab on your Cash App home screen
2. Tap the image of your Cash Card
3. Tap Report Card Lost or Stolen
4. Tap Card Stolen
5. Confirm your mailing address and tap Next
6. Enter your PIN to confirm and follow the prompts to complete your order

If the transaction in question was an authorized peer-to-peer payment, we are unable to file a dispute or refund the payment. You will need to resolve this issue with the recipient directly.

Cash App Support
ref:_00DE0Y7ru._5004W1UqnKe:ref



49.     Ms. Thorne immediately provided the requested information via text message.

50.     Defendants responded with a form response from "Ella with the Cash Support team" that same day that thanked Ms. Thorne for the information provided and demanded still more information (this time regarding the security settings on her phone, whether anyone else had access to her device, etc., and stating that Cash App could not investigate or review her claim unless this additional information was provided).

51.     Specifically, the form follow-up text stated:





- ○ Passcode or Touch ID to authorize Cash payments:
- ○ Push Notifications for Cash App payments:
- ○ An enabled security lock such as a passcode or Touch ID:

3. Does anyone other than you have access to your device?

- ○ Have you contacted them about these transactions?

4. For each unauthorized transaction, provide:

- Date:
- Payment amount:
- Recipient name or $Cashtag:

We will review your claim as soon as we receive this information.

Thank you for your help! In the meantime, feel free to contact me if any other questions or concerns come up. I want to make sure we get everything taken care of.



52.     Ms. Thorne responded on July 6, 2020 by reiterating that she was the victim of fraud, stating:

> $custom60 Scammed me out of $3,000 on
> Friday July 3,2020 in the evening. This was
> fraud and I want my money back to me. I had no
> knowledge. This is one of his 7 illegal
> transactions. He took $1,400, $720, $240
> twice, $120 three times all back to back.
>
> ref:_00DE0Y7ru._5004W1UqnKe:ref

53.     Defendant Square responded on July 9, 2020 ("the Non-Reasoned Denial"), denying the claim with a form response that did not state a reason or disclose Ms. Thorne's right to copies of the documents used during the investigation, stating:

> Hi Cherryann,
>
> This is Ella with Cash Support again, thank you
> for your reply.
>
> I'm sorry to tell you that Cash App is unable to
> cancel or refund this payment. Please resolve
> this issue with the recipient directly.
>
> Before sending a payment, we recommend that
> you:
>
> - Only send funds to people you know
> - Verify the recipient's name before sending
>   funds
> - Double-check the spelling of $Cashtags
> - Double-check the recipient's phone
>   number
>
> I would really like to further assist you with this
> claim. However, no more information can be
> advanced. If anything else comes up, please
> don't hesitate to reach back to us.
>
> Warm regards,

54.     On July 9, 2020, Ms. Thorne provided Defendants with all of the additional information requested on July 6, 2020 (confirming, inter alia, that she had security features activated and that no one else had access to the device).

55.     Defendants responded on July 10, 2020, with a form denial of claim which stated, *inter alia*, that "we do not have enough evidence to determine the activity was unauthorized and have denied your claim" (the "Burden-Is-On-The-Consumer Form Denial"). Specifically, its form response read as follows:



56.    The Burden-Is-On-The-Consumer Form Denial does not provide a legitimate reason for denying the dispute and does not provide notice of Ms. Thorne's right to investigatory materials.

57.    Defendants have thus refused to refund Ms. Thorne the $3,000 that was drained from her account as a result of fraud.

58.    <u>Plaintiff Alonzo.</u> On December 5, 2020, Ms. Alonzo attempted to use her Cash Card at an ATM in Brooklyn, NY, but the pin wouldn't work. She searched on Google for a Cash App customer service number to get help with using her card.

59.    During the call, Ms. Alonzo was instructed to download and install two apps on her phone. She then received text messages from Cash App containing codes the representative on the phone needed. Ms. Alonzo provided the codes believing she was being assisted by a Cash App representative.

60.    The number Ms. Alonzo called turned out to be a fraudulent Cash App support line set up to deceive users and obtain their Cash App and Cash Card account information.

61.    During the call, someone unknown to Ms. Alonzo made three withdrawals from her account, totaling more than $6,000.

62.    Ms. Alonzo asked the representative about the withdrawals and was advised they were working on it. The representative asked if there was another person with a Cash App account to whom the funds from Ms. Alonzo's account could be transferred.

63.    Ms. Alonzo's boyfriend, Wynit (Johnny) Arias, who also had a Cash App account spoke to the representative who instructed Mr. Arias to download the same two apps on his phone. Shortly thereafter, someone unknown to Mr. Arias withdrew $285 from his account.

64. The representative next instructed Ms. Alonzo to purchase a Target gift card so they could put the funds back onto the gift card which Ms. Alonzo did, providing the gift card information to the representative in order to make the transfer.

65. More than a dozen other fraudulent transactions were declined.

66. Ms. Alonzo disputed the transactions with Defendants immediately, that same day, by initiating a complaint through Cash App.

67. Defendants responded via a form, boilerplate message, which was a standardized communication routinely used by Defendants when dealing with consumer disputes.

68. Defendants stated that "[b]efore we can investigate this unauthorized payment, please provide the following information for each transaction in question." Defendants further stated that "[w]ithout answers to each question, we will be unable to investigate further."

69. Specifically, Defendants sent the following communication:

> On Dec 8, 2020, at 10:49 AM, Cash Support <emailsupport@cash.app> wrote:
>
> Hi Flor,
>
> This is Luis from Cash App Support here. Thanks for reaching out. I understand your concern about getting the money back. I know how important this is to you, allow me to shed some light on this.
>
> Before we can investigate this unauthorized payment, please provide the following information for each transaction in question. Without answers to each question, we will be unable to investigate further.
>
> 1. Date:
> 2. Payment amount:
> 3. Recipient name or $Cashtag:
> 4. Reason you are disputing the transaction:
>
> In addition, to help us investigate your claim, please provide the following information:
>
> Provide the make and model of each device used to access your Cash App.
>
> I hope this information is useful to you, If you have any further questions, feel free to reach out to me directly. I'm here if you need me.
>
> Kind regards,
>
> Luis
> Cash App Support.

70.     Ms. Alonzo immediately provided the requested information and asked to speak with a representative.

71.     Defendants responded multiple times with the same form response from "Paul G with Cash App Support," "Manuel from Cash App Support," and "Dany here with the Cash App Support team," among others, all requesting the same information again, which Ms. Alonzo provided again each time.

72.     Ms. Alonzo also repeatedly asked to speak with a representative, but she never received a call from anyone at Cash App.

73.     On December 9, 2020, Ms. Alonzo received yet another response from "Robert here with the Cash App Support team," requesting even more information. The response indicated that "[t]o begin our investigation, you'll need to provide complete answers to all of the following questions" (this time regarding whether Ms. Alonzo was instructed to download any other apps or forward information to a third party). And the email stated that Cash App could not investigate or review her claim unless this additional information was provided.

74.     Specifically, the form follow-up email stated:

Hello Flor,

Robert here with the Cash App Support team, thanks for reaching out! I understand you are inquiring about this money taken from your account without your authorization. I know this is really important to you, so I'll be more than glad to assist you with this request.

To begin our investigation, you'll need to provide complete answers to all of the following questions. We cannot begin an investigation without all of the following information:

1. What is your legal name and email address and/or phone number linked to the account associated with the 'unauthorized' activity?

2. What is the date/time and amounts for the transactions that you believe are in error and why do you believe they were unauthorized?

3. Were you instructed to download any other apps other than Cash App to access the account in question?

4. What is the make and model of the device(s) you were logged into when the transactions took place?

5. Which city & state were you located in when the unauthorized transactions took place?

6. Did you forward or provide any account access information to a third party?

We will review your account as soon as we receive this information.

Cash App Support does not have a phone number to call at this time. We will never ask you to provide your PIN, send a payment, add funds to your balance, make a purchase, or complete a "test" transaction of any kind.

In the meantime, if you have any questions or concerns, please feel free to reach me back out. I'll be happy to help you.

Kind Regards,

Robert F.
Cash App Support



ref:_00D5w7BcER._5005w1g5iuu:ref

75.     On December 10, 2020, Ms. Alonzo responded by answering all of Defendants' questions and reiterating that she "never authorized Cash App to debit my account." She also again requested Cash App call her, stating "I haven't [sic] been able to speak to you directly" and

"I have two small children and with the pandemic I need this money! Please Please Please call me … this is urgent."

**From:** Flor Alonzo ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** 12/10/2020
**To:** Cash Support <emailsupport@cash.app>
**Subject:** Re: Download Transaction History [ ref:_00D5w7BcER._5005w1g5iuu:ref ]

Hello JJ,

Yes, please I really need your help this happened on Saturday December 5, 2020. Please give me a call at ▮▮▮▮▮▮▮▮▮▮. I will also need you to send an account activity history from cash app account from the day and on from December 5, 2020 so That I can show all the people that attempted to make illegal withdrawals from my Cash APP and Cash APP card, i really need this report immediately since it also shows they attempted to use through My CASH APP account my Citibank card in which they had tried to withdraw of different amounts some were on hold and others didn't. If it is difficult for you to call me back please send me the steps i can take on my CASH APP prompts and I will submit my request to speak to one of your CASH APP representatives.

Please help this is the holidays and i'm counting on my funds in order to pay rent and not go homeless with my children.

Best,

76.     On December 13, 2020, Defendants sent Ms. Alonzo a form email stating "[w]e closed your case because it's been more than 3 days since we've heard from you," even though it had not been more than 3 days since Ms. Alonzo's email of December 10, 2020.

77.     Specifically, the form email stated:

Hi Flor,

We closed your case because it's been more than 3 days since we've heard from you.

Please reach out if you still have questions. Here's how:

1. Tap the **profile icon** on your Cash App home screen
2. Tap **Support**
3. Tap **Something Else**
4. Navigate to the category that best fits the issue
5. Tap **Contact Support**

For reference, your case # is: 04706856

Thank you,

Cash App Support

ref:_00D5w7BcER._5005w1g5U2h:ref

78.     Ms. Alonzo asked for her case to be re-opened multiple times and received the same form email indicating her case had been closed "because it's been more than 3 days since we've heard from you" at least three times.

79.     Defendants' refusal to even investigate Ms. Alonzo's claim because of its erroneous assertion that it had "been more than 3 days since we've heard from you," does not provide a legitimate reason for denying the dispute and does not provide notice of Ms. Alonzo's right to an investigation, investigatory materials, and the results of the investigation.

80.     Defendants have thus refused to refund Ms. Alonzo the more than $6,000 that was drained from her account as a result of fraud.

81.     Plaintiff Clements. In November 2020, Ms. Clements was having trouble using her Cash App and Cash Card. She searched on Google for a Cash App support number to get assistance and spoke to "Samuel", who stated he was a Cash App support representative.

82.     Samuel instructed Ms. Clements that she could link her debit card to her Cash App by downloading another app called "Any Desk."

83.     The number Ms. Clements called turned out to be a fraudulent Cash App support line set up to deceive users and obtain their Cash App and Cash Card account information. And the Any Desk app allowed Samuel to remote into to Ms. Clements' phone to make fraudulent Cash App transfers.

84.     Shortly after Ms. Clements made this phone call, $300 was transferred out of her Cash App account using funds from her linked debit card.

85.     Thereafter, someone identified as "Patricia B" began making withdrawals from Ms. Clements' Cash App and Cash Card. In total "Patricia B" made 13 withdrawals in one day of $98 to $102 each, totaling $1,300.

86.     Five other attempted fraudulent transactions were declined.

87.     Ms. Clements called to report the fraudulent transactions using the same number and was told that if Samuel had stolen money from her account, Cash App would put the money back into her account.

88.     Ms. Clements then contacted Square and was told they were not involved.

89.     Ms. Clements also disputed the transactions with Defendants by initiating a complaint through Cash App.

90.     Defendants responded via a form, boilerplate communication routinely used by Defendants when dealing with consumer disputes.

91.     Defendants responded that Ms. Clements had not provided "complete answers for each question" and that Ms. Clements could not file a claim without providing the requested answers.

92.    Specifically, the form email stated:

> Hello Robin,
>
> Allister here again, thanks so much for reaching back out to Cash App Support. I really appreciate your patience and apologize for my delayed response.
>
> We did not receive complete answers for each question. Without these answers, we cannot file your claim.
>
> To begin our investigation, you'll need to provide a complete answer to each of the following questions:
>
>   1. What is your legal name and email address and/or phone number linked to the account associated with the 'unauthorized' activity?
>   2. What is the date/time and amounts for the transactions that you believe are in error, and why do you believe they were unauthorized?
>   3. Were you instructed to download any other apps other than Cash App to access the account in question?
>   4. What is the make and model of the device(s) you were logged into when the transactions took place?
>
>   5. Which city & state were you in when the transactions took place?
>   6. Did you forward or provide any account access information to a third party?
>
> We will review your account as soon as we receive this information.
>
> Cash App Support does not have a phone number to call at this time. We will never ask you to provide your PIN, send a payment, add funds to your balance, make a purchase, or complete a "test" transaction of any kind.
>
> Thanks again for reaching out to Cash App Support, Robin. Feel free to reach out anytime. We're always happy to assist.
>
> Warmest regards,
> Allister
> Cash App Support 
>
> ref:_00D5w7BcER._5005w1d4lte:ref

93.    Ms. Clements responded the same day with detailed answers to each question:

| | |
|---|---|
| **From:** | ████████ |
| **To:** | Cash Support; ████████ |
| **Subject:** | RE: Missing Payment [ ref:_00D5w7BcER._5005w1d4lte:ref ] |
| **Date:** | Sunday, November 15, 2020 11:59:08 PM |

1. Robin A Clements

 ████████
 ████████

 Cell: ████████

2.  11/05/2020-11:38:55
      $504.00 FROM DIRECT EXPRESS to CASHAPP THEN REMOVED
      11/05/2020 $1.00
THIS PAYMENT WAS SENT TO THOMAS TANUE
      11/05/2020-$1.00
THIS PAYMENT WAS SENT TO REBECCA COOK
      11/05/2020-$1:00
SENT TO PARTRICA BOGART
      11/05/2020-$1.00
SENT TO PATRICIA BOGARD
      11/05/2020-$100.00
SENT TO PARTRICA BOGART
      11/05/2020-$98.00
SENT TO PATRICIA BOGART
      11/05/2020-$102.00
SENT TO PATRICIA BOGARD
      11/05/2020-$101.00
SENT TO PARTRICA BOGART
      11/05/2020-$99.00
SENT TO PARTRICA BOGART
      11/05/2020-$100.00
SENT TO PARTRICA BOGART
      11/05/2020-$99.00
SENT TO PARTRICA BOGART
      11/05/2020-$101
SENT TO PARTRICA BOGART
      11/05/2020-$99.00
SENT TO PARTRICA BOGART
      11/05/2020-$102.00
SENT TO PARTRICA BOGART
      11/05/2020-$99.00
SENT TO PARTRICA BOGART
      11/05/2020-$99.00
SENT TO PARTRICA BOGART
The money was stolen I called cashapp to help with my card he set me up with a new cashapp
card number I realized I was scammed after I found two unknown apps connected to my
cashapp one was an app called APPDESK and the second one was an ACCOUNT 807. I did
some research APPDESK is an app used to steal from people's accounts the ACCOUNT 807
had a. Logo that resembled a Bank of America logo which I believe was part of the scam. I
also had my DIRECT EXPRESS CARD LINKED. THAT IS HOW THEY STOLE THE
$504.00 FROM THAT ACCOUNT.
ALL THE PARTRICA BOGARTS, I REQUESTED A REFUND AND DID A  REFUND

REQUEST so therefore times were not there or the people that stole my money did something. The information above is what shows in cashapp activities. I did not authorize anyone to go into my accounts. I am elderly and disable.

3. I believe so APPDESK.

4. SAMSUNG NOTE10+

5. LYNN MASSACHUSETTS 01902

6. YES DIRECT EXPRESS CARD WAS LINKED that is how the $504.00 was stolen.

*I HAVE FILED A POLICE REPORT I BELIEVE BECAUSE I AM DISABLED AND ELDERLY IT'S LARCENY. THE FBI HAS A CRIME DEPARTMENT THAT IS FOR DISABLED AND ELDERLY PEOPLE. I FILED A REPORT WITH THE FBI ALSO. I ALSO REPORTED THE CASHAPP CARD WHICH MY MONEY WAS STOLEN TO CASHAPP. SUPPORT THEY GAVE ME A NEW ACCOUNT NUMBER. I'VE BEEN WITHOUT FOOD ALL MY UTILITIES ARE ABOUT TO BE DISCONNECTED CAN'T PAY RENT. PLEASE HELP ME RETRIEVE MY $1500 BACK. SORRY I DID THE FIRST QUESTIONNAIRE INCORRECTLY.

MY SINCERE THANKS

ROBIN CLEMENTS

94.     On November 16, 2020, Cash App responded that it would take "up to 10 business days" to complete an investigation. When Ms. Clements did not hear back, she emailed again on November 30, 2020, December 8, 2020, and December 13, 2020.

95.     On December 16, 2020, Cash App responded that the transactions were "sent from a known device" and that Cash App did "not have enough evidence to determine the activity was unauthorized" and that "as a result, we have denied your claim."

96.     Specifically, the email stated, in relevant part:

From: Cash Support <emailsupport@cash.app>
Date: 12/16/20 11:04 AM (GMT-05:00)
To: ███████████████
Subject: RE: Subject: RE: Missing Payment [ ref:_00D5w7BcER._5005w1d4lte:ref ]

Hello,

We compared the transaction(s) you brought to our attention with your account history. We determined that the transaction in question was sent from a known device. This device accessed your Cash App account prior to this event.

Based on this information, we do not have enough evidence to determine the activity was unauthorized and as a result, we have denied your claim. This concludes our investigation into this claim.

97.    Defendants' form denial does not provide a legitimate reason for denying the dispute and did not provide notice of Ms. Clements' right to investigatory materials.

98.    Defendants have thus refused to refund Ms. Clements the more than $1,000 that was drained from her account as a result of fraud.

99.    <u>Plaintiff Lovett.</u> On October 13, 2020, Mr. Lovett woke up to find that someone had withdrawn more than $4,700 from his Cash App/Cash Card account while he was sleeping.

100.    Mr. Lovett disputed the transaction with Defendants immediately, that same day, by initiating a complaint through Cash App.

101.    Defendants responded via a form, boilerplate email message, instructing Mr. Lovett how he could reset his Cash App PIN.

102.    When Mr. Lovett responded with the details of the fraudulent transfers, Defendants sent another form, boilerplate email message, which was a standardized communication routinely used by Defendants when dealing with consumer disputes.

103.    Defendants stated that they could not open an investigation into the fraudulent transactions until Mr. Lovett responded to a list of questions.

104.    Specifically, Defendants sent the following communication:

Hi there,

This is Alex from Cash App Support. Thanks for reaching out. I understand you are concerned about canceling a payment, so let me go ahead and provide you more details about it. I'm always happy to help.

After taking a look at your Cash App account, I noticed that the payment is completed.

Before we can investigate this unauthorized payment, please provide the following details within the next 7 business days. This will help us determine the best course of action.

1. How many devices have you used to access your Cash App?
   - Provide the make and model of each device:

2. Respond "yes" or "no" if you had the following security features enabled on your mobile device or Cash App at the time of the transaction:
   - Passcode or Touch ID to authorize Cash payments:
   - Push Notifications for Cash App payments:
   - An enabled security lock such as a passcode or Touch ID:
3. Does anyone other than you have access to your device?
   - Have you contacted them about these transactions?
4. For each unauthorized transaction, provide:
   - Date:
   - Payment amount:
   - Recipient name or $Cashtag:

We will review your claim as soon as we receive this information.

If you have any further questions, feel free to reach out to me directly. Your satisfaction means everything to us!

Kind regards,
Alex
Cash App Support

ref:_00D5w7BcER._5005w1eSQDj:ref

105.    Mr. Lovett provided the requested information that same day.

106.    On the next day, October 14, 2020, Defendants responded that they had determined

"the transaction in question was from a known device" and that "[b]ased on this information, we

do not have enough evidence to determine the activity was unauthorized and have denied your

claim."

From: **Cash Support** <emailsupport@cash.app>
Date: Wed, Oct 14, 2020 at 9:17 AM
To: ████████████████████████████

Hi there,

We compared the transaction you brought to our attention with your account history. We determined that we received the transaction in question from a known device. This device had accessed your Cash App account prior to this event.

Based on this information, we do not have enough evidence to determine the activity was unauthorized and have denied your claim. This concludes our investigation into this claim.

We recommend speaking with anyone who had access to your device at the time of the transaction. If your phone was lost/stolen during the time of the transaction and you wish to file a police report, Square will cooperate in their investigation.

You can also share the following contact information below with law enforcement if you choose to file a report:

Square, Inc.
Attn: Compliance Department
1455 Market St., Suite 600
San Francisco, CA 94103
lawenforcement@squareup.com

Important note: Square will not respond to correspondence sent by non-law enforcement/ government agencies to the addresses above.

To further secure your account, we suggest the following security steps:

- Sign-In Code- Cash App will never request this information outside the app.
- Security Lock- Enable passcode or Touch ID for every in-app Cash App payment.
- Personal Identification Number (PIN)- Protect it and keep it private.
- Do not write it on your card or store it with your card.
- Use a difficult to guess PIN.
- Do not use sequences (1234), DOB, SSN, address, phone number, etc.
- Push Notifications- Enable for every transaction.
- Virtual Card- Tap your in-app Cash Card to hide its details.
- Touch ID / Facial Recognition / Passcode- Enable login security on all devices.
- Each device may vary, please check your device manual for more details.
- Email Two-Factor Authentication- Enable for an additional layer of security.

Please note: *Cash App does not have a direct phone number to call. When they are available, you can request a callback from our support team through the in-app Help Center. *

Also, Cash App support will never ask you to provide your Sign-In Code, PIN, require you to send a payment, add funds to your balance, make a purchase, or complete a "test" transaction of any kind.

Thanks,

Cash Support
ref:_00D5w7BcER._5005w1eSQDj:ref

107.    Defendants' form denial does not provide a legitimate reason for denying the dispute and did not provide notice of Mr. Lovett's right to investigatory materials.

108.    After receiving Defendants' denial, Mr. Lovett filed complaints with the Better Business Bureau and the Consumer Financial Protection Bureau. As a result of those complaints, Defendants determined Mr. Lovett's "Cash App account was compromised" and closed his account. But Mr. Lovett still had $40 in his Cash App account to which he no longer has access and Defendants still refused to refund Mr. Lovett for the fraudulent transactions.

109.    Defendants have thus refused to refund Mr. Lovett the more than $4,700 that was drained from his account as a result of fraud.

110.     Given the wide spread use of Cash App and the Cash Card, and the ever growing prevalence of fraudulent schemes occurring on this platform, the pattern and practice of unlawful conduct set forth herein--which involves improper dispute processing via means of common policies and automated, boilerplate communications impacts thousands, and potentially millions, of consumers.

## CLASS ALLEGATIONS

111.     Plaintiffs bring this claim on behalf of themselves, and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

112.     Plaintiffs seek to represent a nationwide EFTA Class and a New York State GBL 349 Class (collectively, "the Classes").

113.     The EFTA Class is defined as all persons in the United States who:

**a.** have or had an account with Cash App within one year prior to filing of this action; and

**b.** who have a Cash Card or other similar card offered to Cash App customers by Defendants (or who had such a card within one year prior to filing of this action); and

**c.** who filed a dispute regarding an allegedly unauthorized transfer in the past year; and

**d.** who were (i) sent in response one or more communications that required that the person provide dispute information beyond the dispute information explicitly referenced in 15 U.S.C. Sec. 1693f(a) as a condition of accepting, opening, investigating or successfully resolving the dispute in the consumer's favor; or (ii) whose dispute was denied based on the stated grounds that Defendants did not

have enough information or evidence to determine that the activity was unauthorized; or (iii) whose dispute denial failed to include an explanation and/or a notice regarding the consumer's right to documents used during the investigation.

114.     The New York GBL 349 Class is defined as all persons in New York State who:

   **a.** have or had an account with Cash App within one year prior to filing of this action; and

   **b.** who have a Cash Card or other similar card offered to Cash App customers by these two Defendants (or who had such a card within one year prior to filing of this action); and

   **c.** who filed a dispute regarding an allegedly unauthorized transfer in the past three years; and

   **d.** who were (i) sent in response one or more communications that required that the person provide dispute information beyond the dispute information explicitly referenced in 15 U.S.C. Sec. 1693f(a) as a condition of accepting, opening, investigating or successfully resolving the dispute in the consumer's favor; or (ii) whose dispute was denied based on the stated grounds that Defendants did not have enough information or evidence to determine that the activity was unauthorized; or (iii) whose dispute denial failed to include an explanation and/or a notice regarding the consumer's right to documents used during the investigation.

115.     Excluded from the Classes are anyone employed by counsel for Plaintiffs in this action and any Judge to whom this case is assigned, as well as his or her immediate family and staff.

*Numerosity*

116.     As set forth above, there are millions of people who use both Cash App and the Cash Card.

117.     As set forth above, fraud on Cash App, including with regard to consumers who fund their purchases via a Cash Card, is prevalent and growing.

118.     As set forth above, when responding to these disputes Defendants use standardized communications that Plaintiffs allege violate the law.

119.     These standardized communications reflect generalized policies and procedures that Plaintiffs allege violate the law.

120.     Thus, there are undoubtedly many thousands of customers that have already been victims of Defendants' unlawful communications, policies and practices.

121.     And there are millions of consumers who will be subject to these unlawful communications, policies and practices in the future.

122.     As such, the Classes are sufficiently numerous that joinder of all members is impracticable.

123.     Although the exact number of members of the Classes and their addresses are unknown to Plaintiffs, they are readily ascertainable from Defendants' records.

*Existence and Predominance of Common Questions*

124.     Common questions of law and fact exist as to Plaintiffs and all members of the Classes and predominate over questions affecting only individual members of the Classes.

125.    These common questions include:

    a.  Whether the requirements that Defendants impose upon consumers wishing to dispute a transaction as a condition of accepting, opening, investigating or successfully resolving the dispute in the consumer's favor are unlawful under the EFTA and/or New York law.

    b.  Whether Defendants' denial of disputes on the stated grounds that Defendants do not have enough information or evidence to determine that the activity was unauthorized is unlawful under the EFTA and/or New York law.

    c.  Whether Defendants' denial of disputes without providing an explanation and/or the statutorily required notice regarding the consumer's right to investigatory documents is unlawful under the EFTA and/or New York law.

*Typicality*

126.    Each Plaintiff has claims that are typical of the claims of at least one of the Classes because each Plaintiff is a member of one or more of the Classes and is subject to the same unlawful conduct as other members of the Classes.

127.    Thus, Plaintiffs' claims—based on the same facts and legal theories as the claims of all other members of the Classes—are typical of the claims of the Classes.

*Adequacy*

128.    Plaintiffs will fairly and adequately represent the interests of the members of the Classes. Their interests do not conflict with the interests of the members of the Classes they seek to represent.

129.     Plaintiffs have retained counsel experienced in prosecuting class actions and in consumer protection matters. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

*Superiority*

130.     A class action is superior to other available means for the fair and efficient adjudication of the claims at issue.

131.     The damages suffered by each individual member of the Classes may be limited. Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

132.     Further, it would be virtually impossible for each individual member of the Classes to redress the wrongs done to them. Even if the members of the Classes themselves could afford such individual litigation, the court system could not.

133.     Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.

134.     By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

135.     In the alternative, the Classes may be certified because:

   a.   the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes which would establish incompatible standards of conduct for Defendants;

b.  the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

c.  Square, Inc. and Sutton Bank have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

**FIRST CLAIM FOR RELIEF**
**(Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq*.)**

136.    Plaintiffs repeat and re-allege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

137.    The EFTA places sharp limitations on consumer liability for unauthorized transactions. For example, "If the consumer notifies the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.". 12 CFR Sec. 1005.6 ("Liability of consumer for unauthorized transfers"). See, 15 U.S. Code § 1693g ("Consumer liability").

138.    Pursuant to the EFTA, 15 U.S.C. Sec. 1693f(a), Defendants must conduct an investigation of an authorized transaction once the consumer provides a minimum of information.

139.    Specifically, the statute provides in relevant part that:

[O]nce the consumer provides oral or written notice in which the consumer --

**(1)** sets forth or otherwise enables the financial institution to identify the name and account number of the consumer;

**(2)** indicates the consumer's belief that the documentation, or, . . . the consumer's account, contains an error and the amount of such error; and

**(3)** sets forth the reasons for the consumer's belief (where applicable) that an error has occurred,

the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days. Thus, once the account holder provides (1) the name and account number of the consumer; (2) indicates a belief that there is an error and (3) sets forth the reasons for the belief that there is an error, Defendants must ("shall") investigate.

15 U.S.C. Sec. 1693f –Error Resolution.

140.    The EFTA, Section 1693(f) defines "errors" broadly:

(f) ACTS CONSTITUTING ERROR.--For the purpose of this section, an error consists of--
(1) an unauthorized electronic fund transfer;
(2) an incorrect electronic fund transfer from or to the consumer's account;
(3) the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included;
(4) a computational error by the financial institution;
(5) the consumer's receipt of an incorrect amount of money from an electronic terminal;
(6) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this title; or
(7) any other error described in regulations of the Bureau.

*See also*, Regulation E, 12 C.F.R. § 1005.33 ("Procedures for resolving errors"); Official Interpretation of Regulation E, 11(b)(1) ("Notice of Error From Sender").

141.    Where a Defendant determines after its investigation that no error has occurred it

must provide an explanation and inform the consumer of certain rights.

142.    Specifically, 15 U.S.C. Sec. 1693f states in relevant part:

> (d)Absence of error; finding; explanation
>
> If the financial institution determines after its investigation pursuant to subsection (a) or (c) that an error did not occur, it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur. The financial institution shall include notice of the right to request reproductions with the explanation of its findings.

143.    Here, Defendants clearly violate these provisions by regularly, routinely and explicitly requiring far more information as a condition of opening, investigating and/or favorably resolving account holder's disputes than the very limited information required by Section 1693f.

144.    And as set forth above, even when a consumer provides this information, Defendants' standard response requires still more information.

145.    When a consumer does not provide this additional information, the dispute is summarily rejected without the explanation and disclosure of the right to investigatory materials required under 1693f(d).

146.    And even where a consumer does provide this additional information, his or her dispute is subject to rejection due to Defendants' unlawful imposition upon the accountholder of the burden of proof.

147.    Specifically, pursuant to Section 1693g(b), it is Defendants' burden to prove that the disputed transfer was authorized:

> (b) BURDEN OF PROOF.--In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met, and, if the transfer was initiated after the effective

date of section 905, that the disclosures required to be made to the consumer under section 905(a)(1) and (2) were in fact made in accordance with such section.

148. However, Defendants are explicit in their reversal of that burden, regularly denying claims on grounds that they "we do not have enough evidence to determine the activity was unauthorized."

149. Moreover, the EFTA places the burden of proof on the financial institution to demonstrate that challenged transfers were authorized or, if they were unauthorized, that the consumer can be held liable for them. 15 U.S.C. § 1693g(b).

150. Accountholders' rights under the EFTA are non-waivable. Specifically, 15 U.S. Code § 1693l ("Waiver of rights") states, in relevant part: "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter."

151. On information and belief, Defendants' routine violation of the EFTA's error resolution provisions is based in part on its incorrect belief that consumers must indemnify Square for unauthorized transfers, *i.e.* for "(f) any other party's access and/or use of the Services with your unique name, password or other appropriate security code." Square General Terms of Service at ¶ 15.

152. Defendants' acts and omissions set forth above constitute violations of the EFTA.

153. As a direct and proximate result of Defendants' violations of the EFTA, Plaintiffs are entitled to an award of statutory and actual damages as well as attorney's fees and costs.

154. Defendants' routine refusal to accept, open, investigate or resolve disputes in the consumer's favor and their imposition of the burden of proof on the consumer contrary to statute constitute a failure to investigate in good faith and a failure to establish a reasonable basis for believing that the consumers' accounts were not in error, and also constitutes a knowing and

willful conclusion that the accounts in question were not in error when such conclusion could not reasonably have been drawn from the available evidence. These practices thus constitute a violation of 1693f(e), entitling Plaintiffs (and each member of the class) to treble damages.

155.     In addition, Defendants' failure to provisionally recredit Plaintiffs' accounts while investigating constitutes a violation of § 1693f(e), entitling Plaintiffs (and each member of the class) to treble damages.

## SECOND CLAIM FOR RELIEF
**(Deceptive Acts and Practices Unlawful, NYGBL § 349 *et seq.*)**

156.     Plaintiffs Thorne and Alonzo repeat and re-allege and incorporate by reference the foregoing paragraphs.

157.     In the course of its dealings with Plaintiffs Thorne and Alonzo, Defendants have engaged in deceptive conduct in the conduct of business, trade, commerce or the furnishing of a service in this state and constituted a violation of §349 independent of whether Defendants' conduct violated any other law.

158.     Defendants' deceptive conduct included, without limitation, denying dispute claims for unlawful reasons while deceptively stating or inferring that these reasons were proper.

159.     Defendants' conduct as alleged herein is "consumer oriented."

160.     Indeed, far from a "one shot transaction," Defendants engage in the allegedly unlawful conduct on a routine basis with many thousands of consumers using standardized policies, procedures and form/boilerplate communications.

161.     Defendants' misconduct as set forth above is thus part of a recurring policy and practice.

162.     Each of these deceptive acts and practices is one that has a broad impact on consumers.

163.     Due to these violations of NYGBL § 349, Plaintiffs have suffered actual damages and are entitled to:

- actual damages (or fifty dollars per each violation of each class member's rights, whichever is greater);

- statutory damages;

- treble damages;

- punitive damages;

- declaratory judgment that Defendants have violated the statute;

- injunctive relief barring Defendants from henceforth committing the deceptive acts and practices set forth herein;

- costs; and

- reasonable attorney's fees.

**WHEREFORE,** Plaintiffs seek judgment in her favor and damages against Defendants:

A.     An order certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing their attorneys as Class Counsel;

B.     An award of actual damages (or fifty dollars per each violation of each class member's rights, whichever is greater), treble damages, statutory damages, punitive damages, attorney's fees and costs; and

C.     Such other and further relief as may be necessary, just, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: January 29, 2021

SCHLANGER LAW GROUP LLP

By: /s/ Daniel A. Schlanger
    Daniel A. Schlanger
    Evan S. Rothfarb
    80 Broad Street, Suite 1301
    New York, New York 10016
    Telephone: (212) 500-6114
    Facsimile: (646) 612-7996
    Email: dschlanger@consumerprotection.net
    Email: erothfarb@consumerprotection.net


TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, *Admitted Pro Hac Vice*
    Beth E. Terrell, *Admitted Pro Hac Vice*
    Brittany J. Glass, *Admitted Pro Hac Vice*
    Erika L. Nusser, *Admitted Pro Hac Vice*
    936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450
    Email: bterrell@terrellmarshall.com
    Email: bglass@terrellmarshall.com
    Email: enusser@terrellmarshall.com


*Attorneys for Plaintiffs and the Proposed Classes*

<u>CERTIFICATE OF SERVICE</u>

I, Beth E. Terrell, hereby certify that on January 29, 2021, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

> Aliza Pescovitz Malouf
> HUNTON ANDREWS KURTH LLP
> 1445 Ross Avenue, Suite 3700
> Dallas, Texas 75202
> Telephone: (214) 979-8229
> Email: amalouf@hunton.com
>
> *Attorneys for Defendant Sutton Bank*
>
> John P. Amato
> HAHN & HESSEN LLP
> 488 Madison Avenue
> New York, New York 10022
> Telephone:    (212) 478-7200
> Facsimile:    (212) 478-7400
> Email: jamato@hahnhessen.com
>
> Jonathan H. Blavin (*Admitted Pro Hac Vice*)
> MUNGER, TOLLES & OLSON LLP
> 560 Mission Street, Twenty-Seventh Floor
> San Francisco, California 94105-2907
> Telephone: (415) 512-4000
> Facsimile: (415) 512-4077
> Email: jonathan.blavin@mto.com
>
> Erin J. Cox (*Admitted Pro Hac Vice*)
> Laura M. Lopez (*Admitted Pro Hac Vice*)
> MUNGER, TOLLES & OLSON LLP
> 350 South Grand Avenue, Fiftieth Floor
> Los Angeles, California 90071-3426
> Telephone: (213) 683-9100
> Facsimile: (213) 687-3702
> Email: erin.cox@mto.com
> Email: laura.lopez@mto.com
>
> *Attorneys for Defendant Square, Inc.*

DATED this 29th day of January, 2021.

TERRELL MARSHALL LAW GROUP PLLC


By: /s/ Beth E. Terrell *Admitted Pro Hac Vice*
    Beth E. Terrell, *Admitted Pro Hac Vice*
    936 North 34th Street, Suite 300
    Seattle, Washington 98103-8869
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450
    Email: bterrell@terrellmarshall.com

*Attorneys for Plaintiffs and the Proposed Classes*