## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

DEEANN THORNE, FLOR ALONZO, ROBIN CLEMENTS, and DEMETRIUS LOVETT *on behalf of themselves and all others similarly situated*,

     Plaintiffs,

  v.

SQUARE, INC. and SUTTON BANK,

     Defendants.

No. 1:20-cv-05119-NGG-RML

---

## REDACTED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS SQUARE INC. AND SUTTON BANK'S MOTION TO COMPEL ARBITRATION AND TO DISMISS THE FIRST AMENDED COMPLAINT

Jonathan H. Blavin (*admitted pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000

John P. Amato HAHN & HESSEN LLP
488 Madison Ave #14
New York, NY  10022
(212) 478-7200

Erin J. Cox (*admitted pro hac vice*)
Laura M. Lopez (*admitted pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
(213) 683-9100

*Attorneys for Defendant Square, Inc.*

Aliza Malouf
Abigail Lyle (*admitted pro hac vice*)
HUNTON ANDREWS KURTH LLP
Fountain Place
1445 Ross Avenue, Suite 3700
Dallas, TX  75202
(214) 979-8229

*Attorneys for Defendant Sutton Bank*

## TABLE OF CONTENTS

<b><u>Page</u></b>

I.  INTRODUCTION ..................................................................................................1

II.  BACKGROUND ..................................................................................................2

    A.  Plaintiffs Agreed to the Square TOS and Card TOS Multiple Times....................2

        1.  Plaintiff Deeann Thorne ....................................................................3

        2.  Plaintiffs Flor Alonzo, Robin Clements, and Demetrius Lovett................9

    B.  The Square TOS and Card TOS Included an Agreement to Arbitrate All
Disputes and to Delegate Threshold Questions of Arbitrability.......................... 12

    C.  Plaintiffs' Putative Class Action Lawsuit. ....................................................... 14

III.  THE COURT SHOULD COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS ....... 15

    A.  Plaintiffs Agreed to Arbitrate Their Claims. .................................................... 16

        1.  Plaintiffs Agreed to Arbitrate Their Claims Against Defendants
When They Signed Up for Cash App and the Cash Cards. ..................... 16

        2.  Plaintiffs Agreed to Arbitrate Their Claims Through Their Use of
Cash App and the Cash Cards. ........................................................... 20

    B.  Gateway Questions Concerning Arbitrability—Including Enforceability
and Scope—Have Been Clearly and Unmistakably Assigned to the
Arbitrator.................................................................................................... 22

    C.  The Arbitration Agreement Applies to Each of Plaintiffs' Claims, Though
That Is an Issue for the Arbitrator to Decide. ................................................. 23

IV.  THE COURT SHOULD DISMISS PLAINTIFFS' FIRST AMENDED
COMPLAINT..................................................................................................... 24

V.  CONCLUSION ................................................................................................... 25

i

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Aliff v. Vervent, Inc.*,
  2020 WL 5709197 (S.D. Cal. Sept. 24, 2020) ...................................................16

*In re Am. Express Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011) ..............................................................................15

*Arkin v. DoorDash, Inc.*,
  2020 WL 4937825 (E.D.N.Y. Aug. 24, 2020) .....................................................23

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ...........................................................................................15

*AT&T Techs., Inc. v. Commc'ns Wokers of Am.*,
  475 U.S. 643 (1986) .....................................................................................22, 24

*Athon v. Direct Merchs. Bank*,
  2007 WL 1100477 (M.D. Ga. Apr. 11, 2007) ....................................................21

*Benzemann v. Citibank N.A.*,
  622 F. App'x 16 (2d Cir. 2015) .........................................................................24

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991) ...........................................................................................19

*Charter Commc'ns, Inc. v. Garfin*,
  2021 WL 694549 (S.D.N.Y. Feb. 23, 2021) .......................................................24

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ...........................................................................................15

*Cody v. Darden Rests.*, 2013 WL 170367 (E.D.N.Y. Jan. 11, 2013),
  aff'd, 561 F. App'x 25 (2d Cir. 2014) ................................................................25

*Contec Corp. v. Remote Sol. Co.*,
  398 F.3d 205 (2d Cir. 2005) ..............................................................................23

*DirecTV, Inc. v. Imburgia*,
  577 U.S. 47 (2015) .............................................................................................15

*Distributorsoutlet.com, LLC v. Glasstree, Inc.*,
  2016 WL 3248310 (E.D.N.Y. June 10, 2016) .......................................................4

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*In re Facebook Biometric Info. Priv. Litig.*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) .............................................................................17

*Feld v. Postmates, Inc.*,
  442 F. Supp. 3d 825 (S.D.N.Y. 2020) ...............................................................................20

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ...........................................................................................................16

*Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*,
  2019 WL 4647305 (S.D. Ohio Sept. 24, 2019) ..................................................................17

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) ................................................................... 17, 18, 20

*Hidalgo v. Amateur Athletic Union of the U.S., Inc.*,
  468 F. Supp. 3d 646 (S.D.N.Y. 2020) ............................................................................18, 19

*Hofer v. Emley*,
  2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) ...................................................................22

*In re Holl*,
  925 F.3d 1076 (9th Cir. 2019) ...........................................................................................19

*Lee v. Ticketmaster, L.L.C.*,
  817 F. App'x 393 (9th Cir. 2020) ......................................................................................17

*Lewis v. ANSYS, Inc.*,
  2021 WL 1199072 (S.D.N.Y. Mar. 30, 2021) ....................................................................14

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*,
  268 F.3d 58 (2d Cir. 2001) .................................................................................................22

*Martins v. 3PD, Inc.*,
  2013 WL 1320454 (D. Mass. Mar. 28, 2013) .......................................................................4

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66, 74 (2d Cir. 2017) ............................................................... 16, 17, 18, 20

*Montoya v. Comcast Corp.*,
  2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) ....................................................................22

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ................................................................................................15

*Moskalenko v. Carnival PLC*,
  2019 WL 1441127 (E.D.N.Y. Mar. 29, 2019) ....................................................19

*Nghiem v. NEC Elec., Inc.*,
  25 F.3d 1437 (9th Cir. 1994) ..............................................................................18

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ...................................................................... 16, 17

*Nicosia v. Amazon.com, Inc.*,
  384 F. Supp. 3d 254 (E.D.N.Y. 2019) ............................................... 19, 20, 21, 22

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996) ................................................................................23

*Ramasamy v. Essar Glob. Ltd.*,
  825 F. Supp. 2d 466 (S.D.N.Y. 2011) .................................................................14

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ................................................................................16

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ....................................................................................... 15, 22

*Schwartz v. Comcast Corp.*,
  256 F. App'x 515 (3d Cir. 2007) .........................................................................21

*Selden v. Airbnb, Inc.*,
  2016 WL 6476934 (D.D.C. Nov. 1, 2016) ..........................................................17

*Snap-On Bus. Sols., Inc. v. O'Neil & Assocs., Inc.*,
  708 F. Supp. 2d 669 (N.D. Ohio 2010) ...............................................................17

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) ................................................................................17

*Sultan v. Coinbase, Inc.*,
  354 F. Supp. 3d 156 (E.D.N.Y. 2019) .................................................................17

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960) ................................................................24

*VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*,
    717 F.3d 322 (2d Cir. 2013) .........................................................16, 22

STATE CASES

*Nilavar v. Osborn*,
    127 Ohio App. 3d 1 (1998), modified on reconsideration (May 12, 1998)............................20

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
    25 Cal. App. 3d 987 (1972) ...........................................................20

FEDERAL STATUTES

9 U.S.C. § 1 ................................................................. 1, passim

9 U.S.C. § 2 ................................................................. 15, 18

9 U.S.C. § 3 ................................................................. 13, 25

15 U.S.C. § 1693 ............................................................14

STATE STATUTES

Cal. Civ. Code § 1589 ......................................................20

N.Y. Gen. Bus. Law § 349 ..................................................15

RULES

Fed. R. Civ. P. 12 ...........................................................14

Fed. R. Evid. 201 ...........................................................4

AAA Rule 7 .................................................................23

OTHER AUTHORITIES

Restatement (Second) of Contracts § 23 (1981).................................21

Defendants Square, Inc. ("Square") and Sutton Bank ("Sutton" and collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for an order compelling the individual arbitration of all claims made in the First Amended Complaint ("FAC") brought by Plaintiffs Deeann Thorne, Flor Alonzo, Robin Clements, and Demetrius Lovett (collectively, "Plaintiffs") pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA") and dismissing this action.

## I.  **INTRODUCTION**

Plaintiffs agreed to binding, individual arbitration when signing up for and using Cash App (an online application offered by Square that lets people store, send, receive, spend, and invest money), and when they signed up for Cash Card (a debit card issued by Sutton and linked to Plaintiffs' Cash App accounts). Despite agreeing to arbitrate their dispute, however, Plaintiffs seek instead to bring a putative class action to challenge Square and Sutton's processes for investigating alleged third-party fraudulent transactions on Plaintiffs' Cash App and Cash Card accounts. They cannot do so. By the plain terms of their agreements to arbitrate, Plaintiffs' claims must be brought in arbitration.

In signing up to use Cash App, Plaintiffs agreed to Square's General Terms of Service, which include an arbitration provision stating that Plaintiffs "agree to arbitrate any and all Disputes by a neutral arbitrator" in individual arbitration.[1] Similarly, by requesting and using their Cash Cards, Plaintiffs separately agreed to arbitrate any and all disputes against Square and Sutton.[2] Specifically, for each product (Cash App or Cash Card), Plaintiffs were presented with hyperlinks to the terms governing their use of Defendants' products and services, and were instructed that, by continuing in the sign-up process, they were agreeing to those terms.

---

[1] *See* Declaration of Eric Muller ("Muller Decl."), ¶¶ 79–84, Exs. A, F, J, § 21.
[2] *See* Declaration of Chun Wah Wu ("Wu Decl.") ¶¶ 64–69, Exs. B, G § 50; Exs. H, I § 53.

Plaintiffs consented by taking such affirmative steps to complete their account sign up, and again by their continued use of Cash App and their Cash Cards.

The FAA requires that this Court honor and enforce binding agreements to arbitrate. Therefore, because Plaintiffs clearly and unequivocally consented to arbitrate any claims that they may have against Square and Sutton, this Court should compel Plaintiffs' claims to arbitration and dismiss the pending class action complaint.

## II.   BACKGROUND

### A.   Plaintiffs Agreed to the Square TOS and Card TOS Multiple Times.

Square's Cash App provides financial tools for individuals to store, send, receive, spend and invest money. (Muller Decl. ¶¶ 6–7.) Cash App customers can fund their accounts with a bank account or debit card, send and receive peer-to-peer ("P2P") payments (a payment sent from one Cash App customer's account to another Cash App customer's account), and receive direct deposit payments. (*Id.*) Customers also can make purchases with their Cash Card, a Visa prepaid card linked to the balance stored in Cash App, or withdraw funds from an ATM. (*Id.*) The Cash Cards in question in this case were issued by Sutton.

In order to use Cash App, Plaintiffs first had to follow a series of steps to create an account through the Cash App mobile application. (*See, e.g.,* Muller Decl. ¶¶ 10–26.) In order to complete the registration process, Plaintiffs had to accept Square's General Terms of Service ("General TOS") and the Additional Cash Terms of Service ("Cash TOS" and, together with the General TOS, "Square TOS"). In accepting the General TOS, Plaintiffs agreed to arbitrate any and all disputes they had with Square via arbitration. (*Id.* ¶¶ 66, 74, 79–84; Exs. A, F, J § 21.) Only after Plaintiffs completed signing up for Cash App did Plaintiffs have the option to sign up for a Cash Card linked to the Cash App account.

After creating a Cash App account and consenting to the Square TOS, each of the Plaintiffs proceeded to request a Cash Card. In doing so, each Plaintiff agreed to the Cash Card Terms of Service ("Card TOS"). The Card TOS includes both an agreement to be bound by the Square TOS, and its own express arbitration provision requiring Plaintiffs to arbitrate their claims against Square as well as Sutton on an individual basis. (Wu Decl. ¶¶ 64-69, Exs. B, G § 50; Exs. H, I § 53.)

Given that Plaintiffs created their Cash App and Cash Card accounts at different times and used different devices to do so, the sign-up processes varied slightly, but each Plaintiff manifested their agreement to arbitrate through affirmative conduct on multiple occasions.

### 1.   Plaintiff Deeann Thorne

Plaintiff Deeann Thorne ("Deeann" or "Plaintiff Thorne") first created a Cash App account in 2017, but after that account was deactivated in January 2019, Deeann switched to using a Cash App account opened by Cherryann Thorne—a woman residing at the same address as Deeann, but 33 years her senior ("Cherryann"). (Muller Decl. ¶ 27.) Deeann ordered a Cash Card in her own name from Cherryann's Cash App account, and, in doing so, again agreed to the Square TOS and Card TOS. (Wu Decl. ¶ 23.) The transactions at issue in the FAC, which Plaintiffs allege were completed by Deeann, were completed using the Cash App account belonging to Cherryann. (Muller Decl. ¶¶ 5, 27.)

***Plaintiff Deeann Thorne's Initial Cash App Account and Cash Card***:  Plaintiff Thorne first created a Cash App account on October 24, 2017, using her Samsung Galaxy J3 Prime device. (*Id*. ¶ 19.) As part of creating her Cash App account, Plaintiff Thorne was prompted to provide her email address and/or her phone number. (*Id.* ¶ 20, Fig. 5.) Square's records show that Plaintiff Thorne entered a phone number (███-7502) in order to receive the sign-in code



**Figure 7 (excerpt)**

by text, which would have appeared in a form materially identical to that pictured in Figure 7 (*id.* ¶¶ 21–22, Fig. 7).

This text advised Plaintiff Thorne that by entering the sign-in code provided she would be agreeing to the Square TOS, and provided a hyperlink that, if clicked, automatically redirected to the Cash TOS dated August 19, 2017, on Square's website.  (*Id.* ¶¶ 23, 64, Ex. D.)  The webpage and the first paragraph of the Cash TOS included hyperlinks to the General TOS then in effect (dated May 27, 2016) that included an agreement to arbitrate (*id.* ¶¶ 23, 66–68; Ex. A), as depicted in the screenshot below reflecting the webpage as captured by the Internet Archive's Wayback Machine on October 23, 2017[3]:



**Ex. D (excerpt)**

Square's records show that Plaintiff Thorne entered the sign-in code texted to her phone with the hyperlinked terms.  (*Id.* ¶¶ 24–26.)  She later provided a \$cashtag (a unique, customer-

---

[3] *See* Declaration of Erin J. Cox in Support of Request for Judicial Notice ("RJN"), Ex. D.  "[C]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned under Federal Rule of Evidence 201."  *Distributorsoutlet.com, LLC v. Glasstree, Inc.*, 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016); *see also Martins v. 3PD, Inc.*, 2013 WL 1320454, at *16 n.8 (D. Mass. Mar. 28, 2013) (taking judicial notice of "the various historical versions of [a] website available on the Internet Archive at[ ]Archive.org as facts readily determinable by resort to a source whose accuracy cannot reasonably be questioned").

created username and identifier used on Cash App) for the account—$deedeebaby4—and added her email address to the account—deeann.thorne4@gmail.com. (*Id.* ¶ 26.)

After successfully creating her Cash App account, Square's records show that on November 14, 2017, Plaintiff Thorne proceeded to sign up for and request a Cash Card with the display name "Deeann Thorne," to be delivered to 113 Winthrop Street, Brooklyn, NY 11225 ("Winthrop Street Residence"). (*See* Wu Decl. ¶¶ 31–39, Figs. 40–48.) To do so, Plaintiff Thorne opened her Cash App account on her Samsung Galaxy J3 Prime device, clicked on the "Get Cash Card" button, and was presented with a screen materially identical to Fig. 42 (*see id.*



**Figure 42 (excerpt)**

¶ 33), which advised that by clicking the "Continue" button, she was agreeing to the "Terms & Privacy Policy" which were hyperlinked directly above the "Continue" button.

The "Terms & Privacy Policy" hyperlink, if clicked, automatically redirected to the Card TOS (dated November 6, 2017) on Square's website. (*Id.* ¶ 34, Ex. G; RJN, Ex. G.) Square's records show that Plaintiff Thorne accepted the Card TOS by clicking the "Continue" button. (*Id.* ¶ 35.) Plaintiff Thorne actively used her Cash App account and associated Cash Card. (*Id.* ¶ 39.) In January 2019, Square deactivated this Cash App account because it was connected to another account engaged in activity that violated Square's terms of service. (Muller Decl. ¶ 19.)

***Plaintiff Deeann Thorne's Use of Cherryann's Cash App Account***: On May 7, 2018, Cherryann Thorne—who lives at the same Winthrop Street Residence Deeann provided when

signing up for Cash App, and is 33 years older than Deeann—created a Cash App account using an iPhone 7 Plus device.  (*Id.* ¶ 10; Wu Decl. ¶ 17, Figs. 25–28.)

Square's records show that, after downloading the app, Cherryann entered a phone number (███-2885) in order to receive the sign-in code by text.  (Muller Decl. ¶ 11.)  Like Plaintiff Thorne, Cherryann was provided a clickable link to the Square TOS and advised that, by entering the sign-in code, she was agreeing to these terms.  (*Id.* ¶¶ 11–13, Figs. 1–3, Ex. C;



**Figure 3 (excerpt)**

Cash App: 022-281 is your sign in code. By entering, you agree to the Terms, E-Sign Consent, and Privacy Policy:

Terms of Service | Cash App
squareup.com

¶¶ 66–68; Ex. A.)  After entering this code into the app, Square's records show that Cherryann provided "Cherryann Thorne" as her display name for the Cash App account and also provided a $cashtag for the account—$cherriest.  (*Id.* ¶ 17.)  The same day, Cherryann ordered a Cash Card with the display name "Cherryann Thorne," to be delivered to the Winthrop Street Residence.  (*See* Wu Decl. ¶¶ 17–18.)

After Deeann's original Cash App account was deactivated in January 2019, she switched to using Cherryann's Cash App account.  (Muller Decl. ¶ 27.)  Square's records show that, on May 16, 2019, Deeann logged into Cherryann's Cash App using Cherryann's account PIN and changed the "display name" on the account from "Cherryann Thorne" to "Deeann."  (*Id.*; Wu Decl. ¶ 25.)  That same day, Deeann used an iPhone 6s device to order a replacement Cash Card for Cherryann's account, to be delivered to the Winthrop Street Residence, and requested that the display name for this replacement Cash Card be "Deeann Thorne."  (Wu Decl. ¶ 20.)  Square's records show that, to do so, Deeann navigated to a screen displaying Cherryann's Cash Card balance, shown below in a form materially identical to what Plaintiff Thorne would have seen on her iPhone 6s device (Fig. 30); clicked on the image of Cherryann's Cash Card (Fig. 31); clicked the button to report "Problem with Card"; and was presented with a screen that prompted Deeann

to report the previously issued card (the card issued in the name of "Cherryann Thorne") as either stolen or missing (Fig. 32) (*see* Wu Decl. ¶¶ 20–25):



Directly above the buttons "Card Stolen" and "Card Missing," Deeann was notified: "By continuing, you agree to the Terms & Privacy Policy," with a clickable hyperlink that redirected to the Card TOS (dated April 5, 2018) on Square's website. (*Id.* ¶¶ 23–24, Ex. B.) Square's records show that Deeann reported the card as stolen, clicking on the "Card Stolen" button, thereby agreeing to the Card TOS. (*Id.* ¶ 25.) Deeann proceeded to complete her request for this Cash Card by following a series of prompts, including providing the Cash PIN for this account, her signature, her address, and the name she wanted printed on the replacement Cash Card— "Deeann Thorne," rather than "Cherryann Thorne." (*Id.*) Deeann was then presented with a summary of her Cash Card account's features, and had to scroll to the bottom of the page before being presented with the option of pressing the "Continue" button to move forward in the registration process. (*Id.* ¶¶ 26–27.) Deeann could not proceed from this screen without

scrolling to the bottom of the page and clicking "Continue."  (*Id.*)  After scrolling down, Deeann

was presented with the following language for a second time: "By continuing you agree to the

Terms & Privacy Policy," with another clickable hyperlink directing to the Card TOS.  (*Id.*; Figs.

37–38.)  Square's records show that Deeann clicked the "Continue" button, agreeing to the Card

TOS once again.  (*Id.* ¶¶ 28–29.)  Deeann used this Cash Card issued in her name for hundreds

of transactions.  (*Id.* ¶ 30.)



Square's records also show that, on November 12, 2019, Deeann changed the $cashtag on

Cherryann's account from $cherriest to $deethequeen4.  (Muller Decl. ¶ 27.)  Notably, Deeann

used this Cash App account to complete the transactions at issue in the FAC occurring in July

2020 under the Cherryann Thorne account.  (*Id.*)  Deeann also used the email address associated

with her original 2017 Cash App account (deeann.thorne4@gmail.com) to send emails to Square

regarding the transactions at issue in the FAC.  (*Id.*)

2.      **Plaintiffs Flor Alonzo, Robin Clements, and Demetrius Lovett.**

The remaining three Plaintiffs—Alonzo, Clements, and Lovett—each signed up for their

Cash App account and Cash Card in May, June, or September 2020, and followed nearly

identical account creation processes.[4]  First, after downloading Cash App, the three Plaintiffs

reached a screen prompting them to enter their phone number or email.  (Muller Decl. ¶¶ 29, 41,



**Figure 9 (excerpt)**

53.)  Directly under the "enter your phone or email"

command appeared a notice stating: "By entering and tapping

Next, you agree to the <u>Terms,</u> <u>E-Sign Consent</u> & <u>Privacy</u>

<u>Policy</u>," providing clickable hyperlinks.  (*Id.* ¶¶ 30, 42, 54.)

Alonzo and Clements provided their phone numbers, and a

text message was sent to their respective numbers with a

sign-in code and clickable hyperlink following the notice

stating: "By entering you agree to the Terms, E-Sign

Consent, and Privacy Policy."  (*Id.* ¶¶ 31, 44.)  (As an

illustration, Figs. 9 and 10 reflect the Cash App screen and

text message in a form materially identical to that displayed

on Alonzo's iPhone 11; *see id*. ¶¶ 29, 31, Figs. 9–10 therein.)

**Figure 10 (excerpt)**

Lovett provided his email address using his Motorola

Moto G Stylus device and received the sign-in code via email

message, with a clickable button labeled "Log In" below the

following language, with clickable hyperlinks: "By logging into Cash App, you agree to the

Terms of Service, E-Sign Consent, and Privacy Policy."  (*Id.* ¶¶ 55–56; Fig. 18.)

---

[4] Plaintiff Alonzo signed up for Cash App on May 7, 2020, Plaintiff Clements signed up for Cash App on May 4, 2020, and Plaintiff Lovett signed up for Cash App on September 10, 2020.  (Muller Decl. ¶¶ 28, 40, 52.) Plaintiff Alonzo requested a Cash Card on June 22, 2020, Plaintiff Clements requested a Cash Card on May 6, 2020, and Plaintiff Lovett requested a Cash Card on September 11, 2020. (Wu Decl. ¶¶ 40, 46, 52.)

| Figure 18 (excerpt) | Figure 12 (excerpt) |
| --- | --- |
|  |  |

Square's records show that Alonzo, Clements, and Lovett entered their sign-in codes into their respective Cash App accounts.  (Muller Decl. ¶¶ 33–38, 45-50, 55–62.)  Later in the Cash App sign-up process, Alonzo, Clements, and Lovett were prompted to enter their first and last names.  (*Id.* ¶¶ 35, 47, 59.)  Directly beneath that prompt, and above a green "Next" button, appeared a statement, with clickable hyperlinks to the Cash TOS on Square's website: "By continuing, you agree to the Terms, E-Sign Consent & Privacy Policy."  (*Id.* ¶¶ 36, 48, 60; Fig. 12.)  Square's records show that Alonzo, Clements, and Lovett each clicked the "Next" button to complete the account creation.  (*Id.* ¶¶ 38, 50, 62.)

Alonzo, Clements, and Lovett thus took action on three occasions to demonstrate their agreement to the Square TOS in signing up for Cash App—(1) when providing their phone number and/or email address, (2) when logging in with the sign-in codes texted or emailed to

them, and (3) when clicking "Next" after entering their names.  (*Id.* ¶¶ 38, 50, 62.) Each of the hyperlinks presented to Plaintiffs directed to the Cash TOS (dated April 21, 2020) on Square's website, which provided bright green hyperlinks to the General TOS that included an agreement to arbitrate (dated January 1, 2020) below the title and in the first paragraph of the Cash TOS.  (*Id.* ¶¶ 30, 42, 75, Exs. E, F; RJN, Exs. E-F.)

These Additional Cash App Terms of Service (the "Cash Terms") govern your use of Cash App, a payment service and financial platform (the "Service") offered by Square, Inc. ("Square," "we," "our," or "us"). By using the Service you agree to be bound by these Cash Terms, the E-Sign Consent, and the General Terms of Service ("General Terms") and all other terms and policies applicable to each Service as set forth below (e.g.the Payment Terms if you are a Cash for Business Seller defined below). If you are using the Service on behalf of a business or entity, you acknowledge and agree that you have authority to bind such business or entity and that such business or entity accepts these terms. If you use the Service to transact in Bitcoin, you agree to the Additional Virtual Currency Terms of Service (collectively with the E-Sign Consent, General Terms, Cash Terms and Payment Terms, the "Service Terms").

**Exhibit E (excerpt)**

Apart from agreeing to the Square TOS, Alonzo, Clements, and Lovett also proceeded to sign up for Cash Cards in 2020.  (Wu Decl. ¶¶ 40, 46, 52.) These Plaintiffs were guided through a series of screens where they provided information, such as name, address, date of birth, etc. until reaching a final screen titled "Details About Your Card."  (*Id.* ¶¶ 41–42, 47–48, 53–54.)  Alonzo, Clements, and Lovett were required to scroll through a screen containing information about the card before they were presented with the option to click "Continue."  (*Id.* ¶¶ 43, 49, 55; Fig. 52.)  Directly above the "Continue" button, Alonzo, Clements, and Lovett were presented with the following message with a clickable hyperlink: "By continuing you agree to the Terms & Privacy Policy."  (*Id.* ¶¶ 43, 49, 55.)  The hyperlink presented to Clements, if



**Figure 52 (excerpt)**

| | |
|---|---|
| Monthly Fee | $0 |
| Per Purchase Fee | $0 |
| ATM Cash Out | $2 |
| Cost to Add Cash | $0 |
| ATM Balance Inquiries | $0 |
| Customer Service | $0 |
| Inactivity | $0 |

We currently do not offer overdraft or credit features.

FDIC insurance is not available at this time.

For general information about prepaid accounts, visit cfob.gov/prepaid

Find details and conditions for all fees and services in the Cash Card Long Form, which can be viewed at cash.app/cardfees

See More Information about Cash Card

By continuing, you agree to the Terms & Privacy Policy

Continue

clicked, linked to the Card TOS dated January 3, 2020; the hyperlink presented to Alonzo and

Lovett linked to the Card TOS dated May 11, 2020.  (*Id.* ¶¶ 44, 50, 56, Exs. H, I; RJN, Ex. I.)

Square's records show that Alonzo, Clements, and Lovett pressed the "Continue" button directly

under the hyperlinked terms to order their Cash Cards, thus agreeing to the Card TOS.  (*Id.*

¶¶ 45, 51, 57.)  Alonzo, Clements, and Lovett actively used their Cash App and Cash Card

accounts.  (Muller Decl. ¶¶ 28, 40, 52, 77; FAC ¶¶ 34, 37.)

> ### B.     The Square TOS and Card TOS Included an Agreement to Arbitrate All Disputes and to Delegate Threshold Questions of Arbitrability.

The first paragraph in all relevant versions of the General TOS (which as noted above are

referenced and hyperlinked in the Cash TOS and the Card TOS) notes that, by using Square's

services, the user is agreeing to "individual arbitration for any potential legal dispute" and refers

the user to "see Section 21" for details.  (Muller Decl. ¶¶ 80–81, 83, Exs. A, F, J at 1; RJN, Exs.

F, J at 1.)  Section 21 is titled, "Binding Individual Arbitration" and states in unambiguous terms

that: "You and Square agree to arbitrate any and all Disputes by a neutral arbitrator who has the

power to award the same damages and relief that a court can."  (*Id.* § 21.)  The General TOS

define "Disputes" as:

> [A]ny claim, controversy, or dispute between you and Square, its processors, suppliers or licensors (or their respective affiliates, agents, directors or employees), including any claims relating in any way to these Terms or the Services, or any other aspect of our relationship.

(*Id.* § 20.)  The General TOS further specify that "[t]he Federal Arbitration Act, 9 U.S.C. §§ 1–

16, fully applies" and that "[a]ll Disputes will be . . . administered by the American Arbitration

Association [ ] according to this Section and the applicable rules for that forum."  (*Id.* § 21.)  All

versions of the General TOS subsequent to the May 27, 2016 version, including the April 17,

2019 version in place when Plaintiff Thorne requested a replacement Cash Card in her name on

Cherryann's Cash App account, specify that the arbitrator "shall be responsible for determining all threshold arbitrability issues."  (Muller Decl. ¶ 84, Exs. F, J § 21; RJN Exs. F, J § 21.)[5]

In signing up for Cash Cards, all Plaintiffs reconfirmed their agreement to the Square TOS.  At all relevant times, the first paragraph of the Card TOS stated:

> By accepting and using the Card, you agree to be bound by the terms and conditions in this Agreement, ***as well as the Square Terms of Service*** . . . . "Square Terms of Service" means the terms of service for participating in the Cash App program located at https://squareup.com/legal/ua.

(Exs. B, G–I § 1 (emphasis added); RJN, Exs. G, I § 1.)  The hyperlink in the Card TOS redirected users to the General TOS, including its arbitration provision.  (Wu Decl. ¶¶ 61–62.)

At all times the Card TOS also contained a separate mandatory arbitration provision, and called attention to the class action waiver in its first paragraph: "THIS AGREEMENT INCLUDES, AMONG OTHER THINGS, AN ARBITRATION PROVISION CONTAINING A CLASS ACTION WAIVER…."  (Wu Decl. ¶ 65, Exs. B, G-I § 1; RJN, Exs. G, I § 1.)  At the top of the page, the Card TOS contained hyperlinks to each section of the terms, including a hyperlink labeled: "DISPUTE RESOLUTION BY BINDING ARBITRATION: JURY TRIAL WAIVER; CLASS ACTION WAIVER."  (*Id.*)  This provision requires users to arbitrate "any and all controversies, disputes, demands, claims, or causes of action between [the customer] and us….," and explains that: "[a]s used in this Section, 'we' and 'us' . . . . includes Square."  (Wu Decl. ¶ 66, Ex. B, G § 50, Exs. H, I § 53; RJN, Exs. G § 50, I § 53.)  The Card TOS also stated the "arbitration will be governed by the AAA's Commercial Arbitration Rules" and included language expressly delegating issues of arbitrability to the arbitrator:

> For any and all . . . disputes . . . including the interpretation and scope of this Section and the arbitrability of the . . . dispute . . . [Plaintiffs] and [Defendants]

---

[5] At all times the General TOS included the following provision: "We may amend the General T[OS] . . . at any time with notice that we deem to be reasonable in the circumstances, by posting the revised version on our website or communicating it to you through the Services (each a "Revised Version")" and "Your continued use of the Services after the posting of a Revised Version constitutes your acceptance of such Revised Version."  *Id.* ¶ 70, Ex. A § 3.

> agree to resolve any such . . . dispute . . . exclusively through binding and
> confidential arbitration.

(*Id.*)

## C.    Plaintiffs' Putative Class Action Lawsuit

Notwithstanding the binding agreement to individually arbitrate any dispute with Square

or Sutton, Plaintiff Thorne filed a putative class action complaint on October 23, 2020.  (ECF

No. 1.)  Defendants filed a request for a pre-motion conference before this Court, setting forth

their position that Plaintiff Thorne's dispute was subject to arbitration, which this Court granted

on January 15, 2021.  In response, on January 19, 2021, counsel for Plaintiff Thorne submitted a

letter to this Court advising that they would be filing an amended complaint that would "moot"

Defendants' request for a pre-motion conference.  (ECF No. 22.)  On January 29, 2021, Thorne's

counsel filed the FAC, adding three new named plaintiffs (Alonzo, Clements, and Lovett).[6]

(ECF No. 26.)  The FAC does not even reference arbitration, much less allege any facts

suggesting grounds to challenge the enforceability of Plaintiffs' agreements to arbitrate.

In the FAC, Plaintiffs allege that they were Cash App and Cash Card users, that funds

were fraudulently withdrawn from their Cash App and Cash Card account by third parties, and

that Defendants' dispute resolution process to address their complaints is inadequate and

improperly places the burden on the user to prove that a disputed transaction was unauthorized.[7]

Based on these allegations, Plaintiffs assert causes of action under the Electronic Fund Transfers

---

[6] Unlike Plaintiff Thorne, two of these newly added Plaintiffs are not residents of New York, and Defendants
reserve the right to bring a motion to dismiss under Rule 12 for lack of personal jurisdiction in the event this Court
denies the motion to compel arbitration.  *See Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y.
2011) ("A motion to dismiss or stay in favor of arbitration is not a Rule 12 motion or a responsive pleading that
shows the defendant has 'accede[d] to the district court's jurisdiction,' and thus does not waive the right to later
move to dismiss for lack of personal jurisdiction."); *Lewis v. ANSYS, Inc.*, 2021 WL 1199072, at *3 (S.D.N.Y. Mar.
30, 2021) ("[c]ourts will resolve at motion to compel arbitration prior to resolving a motion to dismiss for lack of
personal jurisdiction").  Defendants similarly reserve the right to challenge the pleadings on any other basis
permitted under Fed. R. Civ. P. 12.
[7] FAC ¶ 34; *see also id.* at ¶¶ 37, 43–45, 53–56 (Thorne), ¶¶ 58, 60–66, 71, 76–79 (Alonzo), ¶¶ 81, 83–86, 89, 94,
97 (Clements), ¶¶ 99, 100, 107–108 (Lovett).

Act, 15 U.S.C. § 1693; Plaintiffs Thorne and Alonzo, residents of New York, also assert claims under N.Y. Gen. Bus. Law § 349.

## III.   THE COURT SHOULD COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS.

Each Plaintiff agreed—on numerous occasions—to arbitrate their disputes with Square and Sutton, and the FAA requires that such agreements be enforced by their terms.[8]   The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (federal policy favoring arbitration requires rigorous enforcement of arbitration agreements).   Under the FAA, "in deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement"—but "[b]efore addressing the second inquiry," the court must identify whether it or the arbitrator should decide the issue. *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).   On this point, parties may include in a contract an "agree[ment] to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).   This agreement "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Id*. at 70.   Thus, "[t]he question of *who* is to decide whether a dispute is arbitrable is one that must necessarily precede the question of

---

[8] The General TOS specify that "[t]he Federal Arbitration Act . . . fully applies." (Muller Decl., Exs. A, F, J § 21.) Further, the Card TOS state that "[a]rbitration will be subject to the Federal Arbitration Act and not any state arbitration law." (Wu Decl., Exs. B, G § 50; Exs. H, I § 53.)   The FAA—and the body of federal law developed pursuant to it—governs the interpretation and application of an arbitration provision that is made expressly subject to its provisions. *DirecTV, Inc. v. Imburgia*, 577 U.S. 47, 53–54 (2015) (confirming parties can contractually agree to designate FAA as governing law).   The contracts also "involve[d] [interstate] commerce," 9 U.S.C. § 2, providing an independent reason for applicability of the FAA. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).

*whether* a dispute is arbitrable." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob.*

*Opportunities Partners II L.P.*, 717 F.3d 322, 324 (2d Cir. 2013).

Here, in opening and using Cash App and Cash Card accounts, Plaintiffs entered into contracts with Defendants and agreed to arbitration. Plaintiffs likewise agreed to delegate gateway questions of arbitrability to an arbitrator.

**A.      Plaintiffs Agreed to Arbitrate Their Claims.**

To determine whether the parties agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Plaintiffs' agreements with Defendants contain California and Ohio choice-of-law provisions,[9] but the result is the same in any jurisdiction: Plaintiffs agreed to the terms governing their Cash App and Cash Card accounts, including the arbitration provisions, whether manifested through their actions during the sign-up process or through their use of the accounts. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) ("New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'"); *Aliff v. Vervent, Inc.*, 2020 WL 5709197, at *3 (S.D. Cal. Sept. 24, 2020) ("regardless of which state's law applies"—Ohio, California, or Missouri—"the evidence establishes that an agreement to arbitrate exists").

**1.      Plaintiffs Agreed to Arbitrate Their Claims Against Defendants When They Signed Up for Cash App and the Cash Cards.**

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). One principle that remains unchanged is that "[m]utual manifestation of assent, whether

---

[9] Muller Decl., Exs. A, F, J § 22; Wu Decl., Exs. B, G § 47; Exs. H, I § 50.

by written or spoken word or by conduct, is the touchstone of contract." *Id.* (citation omitted).

Courts regularly hold that the requisite "mutual manifestation of assent" exists when users are

asked to agree to terms, presented with those terms so that they may review them, and asked to

take an action to confirm that they assent to the terms. *See, e.g., In re Facebook Biometric Info.*

*Priv. Litig.*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (agreement enforceable where user had

to "take some action—a click of a dual-purpose box—from which assent might be inferred. A

contract was not foisted upon him simply by passively viewing a website. *Nguyen* advises that

this difference is enough to form a contract."); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835,

839–40 (S.D.N.Y. 2012) (where website page provides: "By clicking Sign Up, you are indicating

that you have read and agree to the Terms of Service" and the phrase "'Terms of Service' is

underlined, an indication that the phrase is a hyperlink;" plaintiff "was informed of the

consequences of his assenting click and he was shown, immediately below, where to click to

understand those consequences. That was enough.")[10] Thus, even "[w]here an offeree does not

have actual notice of certain contract terms, he is nevertheless bound by such terms if he is on

inquiry notice of them and assents to them through conduct that a reasonable person would

understand to constitute assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019).

    Plaintiffs demonstrated their consent to the agreements in signing up for their Cash App

accounts and Cash Cards, and when Plaintiff Thorne requested a replacement Cash Card issued

in her own name in connection with Cherryann's Cash App account. (Muller Decl. ¶ 5; Wu

Decl. ¶ 6.) Plaintiffs were required to take an affirmative step—entering a sign-in code, or

---

[10] *See also Lee v. Ticketmaster, L.L.C.*, 817 F. App'x 393, 394 (9th Cir. 2020) (unreported) (holding that plaintiff validly assented to terms of use, including arbitration provision, when "he clicked the 'Sign In' button" where hyperlink to TOU appeared below button); RJN, Ex. A at 5 (screenshot of sign-in page found sufficient in *Lee v. Ticketmaster*); *Meyer*, 868 F.3d at 78 (same); *Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 161 (E.D.N.Y. 2019); *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016); *Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, 2019 WL 4647305, at *10 n.7 (S.D. Ohio Sept. 24, 2019) ("A clickwrap agreement is formed when the website visitor is required to explicitly manifest assent to the website's terms and conditions by requiring some affirmative act (*e.g.*, clicking 'I agree') before the visitor can proceed further on the website." (citing *Snap-On Bus. Sols., Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 681 (N.D. Ohio 2010))).

clicking a button—to demonstrate their agreement after being provided a hyperlink to the terms and being advised of the consequences of completing the step.[11]   These types of agreements are sometimes referred to as "sign-in-wraps," and "notify the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise the user that he or she is agreeing to the terms of service when registering or signing up."  *Meyer*, 868 F.3d at 75–76 (citation omitted).

In *Meyer*, the Second Circuit analyzed whether users of the Uber ride-share app had reasonable notice of the terms of service, applying California law.  868 F.3d at 70, 74.  The court explained that availability of a contract "only by hyperlink" was sufficient to provide "reasonable notice," and that the plaintiff "unambiguously manifested his assent" to Uber's terms of service by creating an account after being provided a hyperlink to the terms of service and advised that: "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY."  *Id.* at 78, 80; *see also* RJN, Ex. B at Addenda A–B.

At the pre-motion conference on this motion, Plaintiffs' counsel suggested that, because the hyperlinks provided in the Cash App sign-up process redirected to the Cash TOS, which in turn incorporated and provided hyperlinks to the General TOS, the arbitration provision in the General TOS is unenforceable.  This position is legally unsupportable.  Courts have held that the need to "click through multiple hyperlinks" to access the arbitration provision, does not render the arbitration provision unenforceable.  *Hidalgo v. Amateur Athletic Union of the U.S., Inc.*, 468 F. Supp. 3d 646, 659 (S.D.N.Y. 2020) (quoting *Fteja*, 841 F. Supp. 2d at 839).  In *Hidalgo*, the plaintiff argued that he should not be bound by the arbitration provision because the agreement was "'hidden' in the middle of the roughly 170-page" contract.  *Id.*  The various provisions of

---

[11] An arbitration agreement need only be in writing, and no signature by either party is necessary to create a binding arbitration agreement.  *See* FAA, 9 U.S.C. § 2; *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir. 1994) ("While the FAA 'requires a writing, it does not require that the writing be signed by the parties.'" (citation omitted)).

the contract were accessible through various hyperlinks that the plaintiff could click to access the

specific contract, and from there, to access the specific chapter or provision of the contract. *Id.*

The court concluded that the necessity to "click through multiple hyperlinks" in order to reach

the arbitration provision "does not mean that the plaintiff cannot be bound by the arbitration

provision because 'clicking the hyperlinked phrase is the twenty-first century equivalent of

turning over the cruise ticket [containing an enforceable forum-selection clause at issue

in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587–88 [(1991)]]' to read the fine print."

*Id*. (first brackets original).

Similarly, in *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254 (E.D.N.Y. 2019), the

court addressed whether an Amazon.com accountholder agreed to be bound by an arbitration

provision appearing in Amazon's Conditions of Use, which were incorporated by reference in

the Amazon Prime Terms and Conditions ("Prime T&C") and were accessible to the user by

hyperlink during the account creation process. *Id.* at 269. Although the arbitration provision

was located in the Conditions of Use, the court framed the "relevant question" as "whether the

[relevant] sign-up flow provided reasonably conspicuous notice of the Prime T&C and required

the user to manifest assent to those terms." *Id.*[12] The sign-in screen contained a notice directly

below the "sign up" button stating: "By signing up, you acknowledge that you have read and

agree to the <u>Amazon Prime Terms and Conditions</u>," with a hyperlink to the terms. *Id.* The court

found the language left "no doubt as to the legal consequences of proceeding with the

---

[12] "Where it is clear that a party is assenting to a contract that incorporates other documents by reference, the incorporation is valid—and the terms of the incorporated document are binding—so long as the incorporation is 'clear and unequivocal, the reference [is] called to the attention of the other party and he [ ] consent[s] thereto, and the terms of the incorporated document [are] known or easily available to the contracting parties.'" *In re Holl*, 925 F.3d 1076, 1083–84 (9th Cir. 2019) (citation omitted) (original brackets); *see also Moskalenko v. Carnival PLC,* 2019 WL 1441127, at *6-7 (E.D.N.Y. Mar. 29, 2019) (noting "the powerful presumption in favor of enforcing freely negotiated contracts, especially in the arbitration context," and the "same rules apply to terms incorporated by reference"; finding agreement to arbitrate based on incorporation by reference of agreement containing arbitration provision).

transaction," and joined the chorus of courts which have "routinely" found similar sign-up interfaces sufficient. *Id.*; *see* RJN, Ex. C at Appendix A.

Here, it is indisputable that a reasonable user would be on notice of the Square TOS and the Card TOS: Plaintiffs were given notice of the terms at the same time that they registered for their Cash App accounts and requested their Cash Cards, respectively.  In circumstances such as these, courts conclude "that a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account," and be on notice that "their acceptance of the benefit of registration would be subject to contractual terms." *Meyer*, 868 F.3d at 78–79; *see also Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020).  Moreover, "[w]hether or not [Plaintiffs] bother[ed] to look [at the hyperlinked Terms] is irrelevant. . . . [h]ere [Plaintiffs] w[ere] informed of the consequences of [their] assenting click and … w[ere] shown, immediately below, where to click to understand those consequences." *Fteja*, 841 F. Supp. 2d at 839–40.

> **2.    Plaintiffs Agreed to Arbitrate Their Claims Through Their Use of Cash App and the Cash Cards.**

Plaintiffs also manifested their assent to the terms governing the Cash App and Cash Card accounts by using these services.  "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." Cal. Civ. Code § 1589; *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992 (1972) ("an offeree, knowing that an offer has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains"); *Nilavar v. Osborn*, 127 Ohio App. 3d 1, 12 (1998), *modified on reconsideration* (May 12, 1998).  This is, once again, a basic tenet of contract law. Applying foundational contract principles, therefore, "the parties to an arbitration agreement may demonstrate their assent to be bound by the agreement by acting upon or accepting benefits

under the contract containing the arbitration agreement." *Athon v. Direct Merchs. Bank*, 2007 WL 1100477, at *4 (M.D. Ga. Apr. 11, 2007) (unpublished).  Plaintiffs accepted the benefits of their Cash App and Cash Card accounts by using them to complete transactions, and thus are bound by the agreements governing these products and services.  In fact, "[w]hether or not [Plaintiffs] received a copy of the [account] agreement, [they] could not accept services [they] knew were being tendered on the basis of a[n] … agreement without becoming bound by that agreement." *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007) (unpublished) (citing Restatement (Second) of Contracts § 23 (1981)).

The fact that Plaintiff Thorne essentially took over the Cash App account that was originally opened in Cherryann's name does not relieve Plaintiff Thorne of her agreement to arbitrate her dispute with Square and Sutton.  First, Plaintiff Thorne personally agreed to the Square TOS—governing her entire relationship with Square—on four separate occasions, including twice during the process of ordering a replacement Cash Card linked to Cherryann's Cash App account in the name of "Deeann Thorne."  But even if the Court were to ignore Plaintiff Thorne's express and repeated acceptance of multiple agreements requiring her to arbitrate this dispute, she would still be bound to arbitrate based on *Cherryann's* agreement to the Square TOS when she created her Cash App account.  Plaintiff Thorne effectively took over Cherryann's Cash App account—using Cherryann's PIN to log into the account to request a Cash Card issued in her own name, and using the Cash App account for transactions, including those at issue in the FAC occurring in July 2020—she is bound by the terms governing that account.  (Muller Decl. ¶¶ 9, 27, 68, 72; Wu Decl. ¶ 25, Fig. 33; FAC ¶¶ 37, 45–57.)

Courts who have looked at this issue have found that sharing or taking over an account "cannot be used as a back door to undermine the contractual landscape governing internet commerce." *Nicosia*, 384 F. Supp. 3d at 272 (enforcing arbitration provision against

Amazon.com accountholder's husband, who filed a lawsuit in connection with purchases he made using his wife's account). "If the validity of these contract terms waxed and waned depending on the identity of the human user behind the screen, it would impose a cloud of uncertainty over any contract formed over the internet," and courts have not hesitated to hold "that a third-party user of an account is bound by the terms governing the account." *Id.* (citing cases). In situations such as these, under the FAA a non-signatory to an arbitration agreement "may be compelled to arbitrate where it '"knowingly accepts the benefits" of an agreement with an arbitration clause'" based on direct benefits estoppel. *Id.* at 274 (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)).[13]

**B.     Gateway Questions Concerning Arbitrability—Including Enforceability and Scope—Have Been Clearly and Unmistakably Assigned to the Arbitrator.**

Parties may include in a contract an "agree[ment] to arbitrate 'gateway' questions of 'arbitrability' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr.*, 561 U.S. at 68–69. This agreement "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Id.* at 70. Thus, "[t]he question of *who* is to decide whether a dispute is arbitrable is one that must necessarily precede the question of *whether* a dispute is arbitrable." *VRG Linhas Aereas*, 717 F.3d at 324. Here, because the arbitration provisions in Plaintiffs' agreements "clearly and unmistakably" provide for an arbitrator to address questions of arbitrability, the Court must honor those agreements. *AT&T Techs., Inc. v. Commc'ns Wokers of Am.*, 475 U.S. 643, 649 (1986).

---

[13] *See also Montoya v. Comcast Corp.*, 2016 WL 5340651, at *5 (E.D. Cal. Sept. 23, 2016) ("Plaintiffs' admitted use of Defendant's services demonstrates Plaintiffs knowingly exploited the agreement for Defendant's services."); *Hofer v. Emley*, 2019 WL 4575389, at *6 (N.D. Cal. Sept. 20, 2019) (holding direct benefits estoppel compelled nonsignatory plaintiff to arbitration where plaintiff received the direct benefit of using a rental car pursuant to a rental agreement containing an arbitration clause).

All Plaintiffs agreed to arbitration agreements with explicit delegation language.  Each Plaintiff agreed to the Square TOS which expressly noted that the arbitrator "shall be responsible for determining all threshold arbitrability issues." (Muller Decl., Exs. A, F, J § 21.)  Further, each Plaintiff agreed to the Card TOS, which similarly provided that all disputes, "including . . . the arbitrability of the . . . dispute," shall be resolved through arbitration.  (Wu Decl., Exs. B, G § 50; Exs. H, I § 53.)  This language is tantamount to a "clear and unmistakable agreement" to arbitrate the question of arbitrability.  *See Arkin v. DoorDash, Inc.*, 2020 WL 4937825, at \*4–5 (E.D.N.Y. Aug. 24, 2020) (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)) ("language[ ]requiring arbitration of disputes related to any aspect of the relationship between the parties, which includes the agreement to arbitrate itself[ ]is sufficient to delegate questions of arbitrability to the arbitrator").[14]

The Court should therefore compel arbitration, and leave for the arbitrator to decide the enforceability of the agreement, and whether Plaintiffs' claims are within the scope of the agreement to arbitrate.

**C.**      **The Arbitration Agreement Applies to Each of Plaintiffs' Claims, Though That Is an Issue for the Arbitrator to Decide.**

Even if this Court were to reach the arbitrability question—which it should not, because that question has been reserved for the arbitrator—the claims at issue here are covered by the arbitration agreement.  "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an

---

[14] Additionally, at all relevant times, the parties' arbitration agreements incorporated the *AAA Commercial Arbitration Rules.*  Rule 7 of the *AAA Commercial Arbitration Rules* provides that the arbitrator shall decide "the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim," shall likewise decide "the existence or validity of a contract of which an arbitration clause forms a part."  (Muller Decl., Exs. A, F, J § 21; Wu Decl., Exs. B, G § 50; Exs. H, I § 53.)  Because the AAA Rules give the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," the parties' incorporation of those rules "serves as clear and unmistakable evidence of the parties' intent" to delegate the determination of arbitrability to an arbitrator.  *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005).

interpretation that covers the asserted dispute." *AT&T Techs.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960)).  And where the arbitration clause is sufficiently broad, as is the case here, there is a heightened presumption of arbitrability such that "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.* (citation omitted).

That principle plainly applies here.  The General TOS provide that the parties "agree to arbitrate any and all Disputes . . ." and define "Disputes" as "any claim, controversy, or dispute between you [Plaintiff] and Square . . . including any claims relating in any way to these General Terms, any Additional Terms, or the Services, or any other aspect of our relationship."  (Muller Decl., Exs. A, F, J §§ 20–21.)  In addition, the Card TOS state that "any and all controversies, disputes, demands, claims, or causes of action" will be resolved "exclusively through binding and confidential arbitration."  (Wu Decl., Exs. B, G § 50; Exs. H, I § 53.)  Every cause of action in Plaintiffs' FAC relates to their use of Cash App and/or the Cash Card.  Plaintiffs allege that funds were fraudulently withdrawn from their Cash App and Cash Card accounts, and that they contacted Defendants to initiate a dispute resolution process in connection with those allegedly fraudulent transfers.  (FAC ¶¶ 45, 53–56 (Thorne); *id.* ¶¶ 66, 71, 76–79 (Alonzo); *id.* ¶¶ 89, 94, 97 (Clements); *id.* ¶¶ 100, 107–108 (Lovett).)  Therefore, the claims at issue here are squarely covered by the arbitration agreement.

## IV.   THE COURT SHOULD DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT.

Upon determining that a dispute is subject to arbitration, "the district court has discretion in determining whether to stay or dismiss the case pending arbitration." *Charter Commc'ns, Inc. v. Garfin*, 2021 WL 694549, at *14 (S.D.N.Y. Feb. 23, 2021) (citing *Benzemann v. Citibank N.A.*, 622 F. App'x 16, 18 (2d Cir. 2015)).  "[C]ourts have the discretion to dismiss—rather than

stay—an action when all of the issues in it must be arbitrated." *Cody v. Darden Rests.*, 2013 WL 170367, at *2 (E.D.N.Y. Jan. 11, 2013), *aff'd,* 561 F. App'x 25 (2d Cir. 2014) (compelling arbitration and dismissing case without prejudice).  Here, the Court should dismiss Plaintiffs' lawsuit because the entire controversy between Plaintiffs and Defendants is governed by the arbitration provisions and may be resolved by arbitration.

Accordingly, Defendants respectfully request that this Court exercise its discretion and dismiss Plaintiffs' FAC.  However, in the event the Court determines that dismissal is improper, in the alternative, Defendants request that this Court issue a stay pending the arbitration.  *See* 9 U.S.C. § 3.

## V.    **CONCLUSION**

For the reasons stated above, Plaintiffs should be compelled to arbitrate their claims against Defendants, and the Court should exercise its discretion to dismiss Plaintiffs' FAC.

DATED:
            May 21, 2021

By:   */s/ John P. Amato*
            Jonathan H. Blavin (*admitted pro hac vice*)
            MUNGER, TOLLES & OLSON LLP
            560 Mission Street, Twenty-Seventh Floor
            San Francisco, California 94105-2907
            (415) 512-4000

            Erin J. Cox (*admitted pro hac vice*)
            Laura M. Lopez (*admitted pro hac vice*)
            MUNGER, TOLLES & OLSON LLP
            350 South Grand Avenue, Fiftieth Floor
            Los Angeles, California 90071-3426
            (213) 683-9100

John P. Amato
HAHN & HESSEN LLP
488 Madison Ave #14
New York, NY  10022
(212) 478-7200

*Attorneys for Square, Inc.*

DATED:
      May 21, 2021

By:   */s/ Aliza Malouf*
      Aliza Malouf
      Abigail Lyle (*admitted pro hac vice*)
      HUNTON ANDREWS KURTH LLP
      Fountain Place
      1445 Ross Avenue, Suite 3700
      Dallas, TX  75202
      (214) 979-8229

*Attorneys for Sutton Bank, Inc.*