UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DEEANN THORNE, FLOR ALONZO, ROBIN
CLEMENTS, and DEMETRIUS LOVETT, on
behalf of themselves and all others similarly
situated,

Plaintiffs,

-against-

SQUARE, INC. and SUTTON BANK,

Defendants.

**MEMORANDUM & ORDER
20-CV-5119 (NGG) (TAM)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendants Square, Inc. and Sutton Bank offer their users a mobile payment platform called "Cash App" and "Cash Card." Plaintiffs allege that they were Cash App and Cash Card users, that funds were fraudulently withdrawn from their Cash App and Cash Card account by third parties, and that Defendants' dispute resolution process to address their complaints is inadequate and improperly places the burden on the user to prove that a disputed transaction was unauthorized. As a result, Plaintiffs assert causes of action on behalf of themselves and others similarly situated under the Electronic Fund Transfers Act, 15 U.S.C. § 1693 and N.Y. Gen. Bus. Law § 349. Defendants respond that Plaintiffs agreed to individually arbitrate any dispute involving their Cash App and Cash Card accounts. They now move pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, to compel arbitration and dismiss the complaint. For the reasons that follow, Defendants' motion is GRANTED.

## I. BACKGROUND

### A. Record on Review

Defendants submit declarations from Eric Muller and Chun Wah Wu, mobile engineers employed by Square who are familiar with Cash App and Cash Card services. (Decl. of Eric Muller ("Muller Decl.") (Dkt. 35-2); Decl. of Chun Wah Wu ("Wu Decl.") (Dkt. 35-9).) Muller and Wu represent that Defendants maintained records of when and how its users registered for its services. (Muller Decl. ¶¶ 4-5; Wu Decl. ¶¶ 4-6.) Thus, Muller and Wu could determine the date and the method by which each Plaintiff registered, *e.g.*, by iPhone, Samsung Galaxy, or some other device.

These declarations include screenshots of the relevant sign-up flow that each Plaintiff would have viewed when registering for Cash App and requesting a Cash Card. Plaintiffs do not dispute the accuracy of these screenshots,[1] and the court accepts them as the true and accurate depiction of the sign-up interface Plaintiffs viewed in registering for Cash App and requesting a Cash Card. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 70 (2d Cir. 2017) (analyzing screenshots of the Uber App's registration process submitted by an Uber software engineer).

Defendants also ask the court to take judicial notice of archived webpages from the Wayback Machine[2] of the terms of service in

---

[1] Plaintiffs provide their own screenshots of the Cash App and Cash Card sign-up flow. (Pls.' Opp. at 1, 4-9.) But these screenshots were taken in June 2021—more than a year after Plaintiffs registered for Cash App and requested a Cash Card. (*See* Decl. of Jodi Nuss Schexnaydre (Dkt. 36-1) ¶ 4.) Because these images do not depict what Plaintiffs viewed during the registration process, these screenshots are not relevant.

[2] The Wayback Machine is an online digital archive of web pages—"a digital library of Internet sites"—run by the Internet Archive, a nonprofit library in San Francisco. *See* https://archive.org/about/; *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 844 F. App'x 343, 346 n.2 (Fed. Cir. 2021).

effect when each Plaintiff registered for Cash App and requested a Cash Card. (*See* Decl. of Erin Cox ("Cox Decl.") (Dkt. 35-14), Exs. D-J (Dkts. 35-18 - 35-23).)[3] "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). If a fact satisfies that standard, "[t]he court . . . *must* take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2) (emphasis added). "However, 'because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence . . . and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b).'" *Moroughan v. Cty. of Suffolk*, 514 F. Supp. 3d 479, 513 (E.D.N.Y. 2021) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)). Here, Plaintiffs neither dispute the accuracy of these archived pages, nor offer anything in rebuttal. The court therefore joins the chorus of others and takes judicial notice of these archived webpages from the Wayback Machine as the relevant terms of service that Plaintiffs would have respectively viewed when registering for Cash App and requesting a Cash Card. *See Distributorsoutlet.com, LLC v. Glasstree, Inc.*, No. 11-CV-6079 (PKC) (SLT), 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016) (taking judicial notice of archived webpages available through the Wayback Machine); *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374-75 (Fed. Cir. 2021) (same); *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D. Fla. 2019) (same, collecting cases).

---

[3] Defendants submit these webpages as exhibits attached to a declaration in support of the motion to compel arbitration and dismiss the complaint. Erin Cox affirms these archived page Exhibits as the true and correct copies in her Declaration. (Cox Decl. ¶ 2.)

### B. Factual Background

Each Plaintiff registered for Cash App and requested a Cash Card at different times, on different devices. Yet only Plaintiff Deeann Thorne's sign-up flow differed materially from her co-Plaintiffs Flor Alonzo, Robin Clements, and Demetrius Lovett, all of whom registered within the same period in 2020[4] and thus experienced a near-identical sign-up flow with substantially the same terms of service. The following provides first what Plaintiffs viewed when registering for Cash App, then what they viewed when requesting a Cash Card.[5]

### 1. Cash App Sign-Up Flow and Terms

#### a. *Deeann Thorne*

Deeann Thorne used a Samsung Galaxy J3 Prime to download Cash App on October 24, 2017.[6] (Muller Decl. ¶ 20.) The App prompted her to provide her email address or phone number to start the sign-up process. (*Id.*) Thorne entered her phone number. (*Id.* ¶ 21.) In response, the App sent her a text message with

---

[4] Alonzo signed up for Cash App on May 7, 2020, Clements on May 4, 2020, and Lovett on September 10, 2020. (Muller Decl. ¶¶ 28, 40, 52.) Alonzo requested a Cash Card on June 22, 2020, Clements on May 6, 2020, and Lovett on September 11, 2020. (Wu Decl. ¶¶ 40, 46, 52.)

[5] For simplicity, the court cites to the Muller and Wu Declarations which incorporate the archived terms of service by Exhibit. The court also uses images from Alonzo's sign-up flow (which she completed on her iPhone 11) to represent her, Clements, and Lovett's sign-up experience.

[6] The court analyzes Deeann Thorne's agreement to arbitrate on the sign-up flow that she experienced using her Samsung Galaxy in 2017. As Defendants explain, though, Thorne later took over another Cash App user's account as her own. Thorne also requested a personal Cash Card from that account. Because Thorne's 2017 sign-up flow is sufficient to decide this motion, however, the court need not consider the effect of Thorne's use of this other account, which involved a sign-up experience similar to Alonzo, Clements, and Lovett, and would be analyzed like theirs. *See also Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 272-74 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020).

a six-digit sign-in code which advised, "By entering, you agree to the Terms, E-Sign Consent, and Privacy Policy: https://squareup.com/legal/cash-ua." (*Id.* ¶ 21, Fig. 6.) Below the link was a "Tap to load preview" message, which, if tapped, produced a preview to the hyperlinked page. It would have looked like this:



(*Id.* ¶ 22, Fig. 7.)

To continue her registration, Thorne needed to return to Cash App, which then presented a screen with a blank "Confirmation Code" panel and a number pad. (*Id.* ¶ 24, Fig. 8.) Square's records show that Thorne entered the six-digit sign-in code, pressed "Next," and successfully completed her Cash App registration. (*Id.* ¶¶ 24-26.)

The hyperlinked URL from that text message directed to a webpage with Square's "Additional Cash Terms of Service." (*Id.* ¶ 23; *see* Ex. D to Muller Decl., 2017 Additional Cash Terms (Dkt. 35-5).) The first paragraph of the Additional Cash Terms of Service provided that, "By using the Service, you agree to be bound by . . . the **General Terms of Service**," where "General Terms of

Service" presented a hyperlink in a bold, blue text. (Ex. D to Muller Decl., 2017 Additional Cash Terms at 1.) Clicking that link directed to a new webpage with Square's General Terms of Service, which provided that, "By using any of the Services you agree to these General Terms and any policies referenced within [], including terms that limit our liability (see Section 18) and require individual arbitration for any potential legal dispute (see Section 21)." (Muller Decl. ¶¶ 66-69; *see* Ex. A to Muller Decl., 2016-2018 General Terms of Service (Dkt. 35-3).) Reaching Section 21, titled "Binding Individual Arbitration," required scrolling down a list of consecutively numbered sections. It provided that:

> You and Square agree to arbitrate any and all Disputes by a neutral arbitrator who has the power to award the same damages and relief that a court can. . . . All Disputes will be resolved . . . by binding individual arbitration. . . . The Federal Arbitration Act, 9 U.S.C. §§ 1-16, fully applies.

(Ex. A to Muller Decl., 2016-2018 General Terms of Service at 12-13.) "Dispute" was defined as "any claim, controversy, or dispute between you and Square, . . . including any claims relating in any way to these Terms or the Services, or any other aspect of our relationship." (*Id.* at 12.)

>    b.   *Flor Alonzo, Robin Clements, and Demetrius Lovett*

Plaintiffs Alonzo, Clements, and Lovett downloaded Cash App in 2020. The App prompted them to enter their phone number or email. Directly below this prompt appeared a notice with underlined, clickable hyperlinks: "By entering and tapping Next, you agree to the <u>Terms</u>, <u>E-Sign Consent</u> & <u>Privacy Policy</u>." (Muller Decl. ¶¶ 30, 42, 54.) That screen looked like this:



(*Id.* ¶ 29, Fig. 9.)

Alonzo and Clements entered their phone numbers. In response, the App sent them a text message with a six-digit sign-in code which advised, "By entering, you agree to the Terms, E-Sign Consent, and Privacy Policy: https://squareup.com/legal/cash-ua." (*Id.* ¶¶ 31-32, 43-44.) This text message was the same as that sent to Thorne. Lovett entered his email using his Motorola Moto G Stylus. (*Id.* ¶ 55.) In response, the App sent him an email with a six-digit sign-in code, which included a clickable "Log In" button

below the following notice with underlined, clickable hyperlinks in light grey font: "By logging into Cash App, you agree to the Terms of Service, E-Sign Consent, and Privacy Policy." (*Id.* ¶¶ 55-56; Fig. 18.) The text sent to Alonzo and Clements, and the email sent to Lovett, looked like this:



(*Id.* ¶ 31, Fig. 10.)



(*Id.* ¶ 55, Fig. 18.)

Alonzo and Clements continued the registration process by returning to Cash App, which presented a blank "Confirmation Code" panel and a number pad. (*Id.* ¶¶ 36, 48.) Lovett had the option to either click the "Log In" button (which returned him to Cash App and automatically populated the sign-in code), or to manually enter the sign-in code. (*Id.* ¶ 57.) Each Plaintiff entered the six-digit sign-in code. (*Id.* ¶¶ 36, 48, 60.) The App then prompted Plaintiffs to enter their Full Name. (*Id.*) After entering their Name, they were presented with another "Next" button at the bottom of the screen. (*Id.*) Directly above that button appeared the now-familiar notice with underlined, clickable

hyperlinks: "By continuing, you agree to the <u>Terms</u>, <u>E-Sign Consent</u> & <u>Privacy Policy</u>." (Id. ¶¶ 36, 48, 60; Fig. 12.) That screen looked like this:



(*Id.* ¶ 35, Fig. 12.)

Square's records show that Alonzo, Clements, and Lovett each clicked "Next," and successfully completed their Cash App registration. (*Id.* ¶¶ 38, 50, 62.)

All told, Plaintiffs Alonzo, Clements, and Lovett received three hyperlinks during the registration process. Each hyperlink directed to a webpage with Square's "Additional Cash Terms of Service." (*See* Ex. E to Muller Decl., 2018-2020 Additional Cash

Terms (Dkt. 35-6).) Below the heading titled "Additional Cash Terms of Service," was the sub-heading titled "General Terms of Service." (*Id.* at 1.) The first paragraph of this General Terms of Service section provided that

> These Additional Cash App Terms of Service (the "Cash Terms") govern your use of Cash App . . . . By using the Service you agree to be bound by these Cash Terms, the **E-Sign Consent**, and the **General Terms of Service** ("General Terms") and all other terms and policies applicable to each Service as set forth below (e.g. the **Payment Terms**).

(*Id.*) "E-Sign Consent," "General Terms of Service," and "Payment Terms" were hyperlinks in bright green (but not bold) text. (*Id.*) Clicking the General Terms of Service link directed to a webpage with Square's General Terms of Service. (*See* Muller Decl. ¶¶ 74-75; *see* Ex. F to Muller Decl., 2019-2020 General Terms of Service (Dkt. 35-7).) This page provided the same General Terms of Service and binding arbitration provision presented to Thorne. Under these General Terms of Service, however, Section 21 also provided that "The Arbitrator shall be responsible for determining all threshold arbitrability issues." (Ex. F to Muller Decl., 2019-2020 General Terms of Service at 13.)

### 2. Cash Card Sign-Up Flow and Terms

#### a. *Deeann Thorne*

One month after registering for Cash App, Thorne requested a Cash Card. (Wu Decl. ¶ 31.) To do so, Thorne opened Cash App and tapped "Cash App balance," which presented a screen with a "Cash Card" button at the top of the page. (*Id.*) Clicking that button presented a new screen with a faded mock-up of a Visa debit card. (*Id.* ¶¶ 31-32.) Below that card, another button: the "Get Cash Card" button. (*Id.* ¶¶ 32-33.) Clicking that button presented yet another screen with the message, "Get a free custom Visa Debit Card to use with your app!" at center; a green, bold

"Continue" button at bottom; and, directly above "Continue," a notice with an underlined, clickable hyperlink: "By continuing, you agree to the Terms & Privacy Policy." (*Id.* ¶¶ 33-34, Fig. 42.) That screen looked like this:



(*Id.* ¶ 33, Fig. 42.) Square's records show that Thorne clicked Continue and successfully requested a Cash Card. (*Id.* ¶¶ 35-36.)

Clicking the Terms & Privacy Policy link directed to the Cash Card Terms of Service then in effect. (*Id.* ¶ 34.) Those Terms of Service began with a Table of Contents. (*See* Ex. G to Wu Decl., 2017 Cash Card Terms of Service (Dkt. 35-11).) The Table of Contents included 51 blue, hyperlinked section headings. (*See id.*) Section

50 provided, in all caps, "DISPUTE RESOLUTION BY BINDING ARBITRATION; JURY TRIAL WAIVER; CLASS ACTION WAIVER." (*Id.* at 3.) In addition, Section 1 provided (in the first paragraph of the first section, titled "This Agreement") that:

> THIS AGREEMENT INCLUDES, AMONG OTHER THINGS, AN ARBITRATION PROVISION CONTAINING A CLASS ACTION WAIVER . . . . BY ACTIVATING YOUR VIRTUAL CARD . . . YOU REPRESENT THAT YOU HAVE READ AND UNDERSTAND THIS AGREEMENT AND YOU AGREE TO BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT.

(*Id.* at 4.) Section 50 provided that:

> For any and all controversies, disputes, demands, claims, or causes of action between you and us (including the interpretation and scope of this Section and the arbitrability of the controversy, dispute, demand, claim, or cause of action) relating to the Cards, the Card Accounts, or this Agreement . . . , you and we agree to resolve any such controversy, dispute, demand, claim, or cause of action exclusively through binding and confidential arbitration.

(*Id.* at 13-14.)

>   b.   *Flor Alonzo, Robin Clements, and Demetrius Lovett*

Shortly after registering for Cash App, Plaintiffs Alonzo, Clements, and Lovett requested Cash Cards. (Wu Decl. ¶¶ 40, 46, 52.) To do so, they first clicked the "Get Free Cash Card" button; the App then guided them through a series of screens, prompting them to provide personal information, such as name, address, and date of birth, until reaching a final screen titled "Details About Your Card." (*Id.* ¶¶ 40-42, 47-48, 53-54.) The App required Plaintiffs to scroll briefly through about one page of Cash Card information, before being presented the option to click "Continue" at the bottom of the page. (*Id.* ¶¶ 43, 49, 55.) Directly

above that button appeared the following notice with an under-lined, clickable hyperlink: "By continuing you agree to the Terms & Privacy Policy." (*Id.* ¶¶ 43, 49, 55.) That screen looked like this:



(*Id.* at ¶ 42, Fig. 52.) The page that Clements and Lovett viewed provided the same underlined, clickable hyperlink in green text.[7] Square's records show that Alonzo, Clements, and Lovett clicked

---

[7] The hyperlink presented to Clements, if clicked, linked to Cash Card Terms of Service dated January 3, 2020; the hyperlink presented to Alonzo and Lovett linked to Cash Card Terms of Service dated May 11, 2020. There is no relevant distinction between these two versions of Cash Card terms or service.

Continue and successfully requested their Cash Cards. (*Id.* ¶¶ 45, 51, 57.)

Clicking the Terms & Privacy Policy link directed to the Cash Card Terms of Service then in effect. These Terms of Service provide the same Cash Card Terms of Service as the terms presented to Thorne.[8] (*See* Exs. H-I to Wu Decl., Cash Card Terms of Service (Dkts. 35-12 - 35-13).)

## II. STANDARD OF REVIEW

The FAA provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may file a motion to compel, which a court must grant "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.

A motion to compel arbitration requires the court to address two issues: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).[9] Both questions are decided under state contract law.[10] *Nicosia v.*

---

[8] The only difference between these terms: Thorne's arbitration provision was listed at Section 50, and Alonzo, Clements, and Lovett's arbitration provisions were listed at Section 53.

[9] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted and all alterations are adopted.

[10] Plaintiffs argue that New York law applies. (*See* Pls.' Opp. at 11-12.) Defendants are indifferent, arguing that the same outcome would result in California (where Square is incorporated), Ohio (where Sutton is incorporated), or New York. (*See* Defs.' Mot. at 16 (citing *Meyer*, 868 F.3d at 74

*Amazon.com, Inc.*, 384 F. Supp. 3d 254, 263 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020). The first question is decided by the court; the second depends on "whether the parties have submitted a particular dispute to arbitration, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

In deciding a motion to compel arbitration, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Allegations related to arbitrability are evaluated to determine "whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). The court may consider "all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits." *Meyer*, 868 F.3d at 74.

---

("New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'"); *Aliff v. Vervent, Inc.*, No. 20-CV-697 (DMS) (AHG), 2020 WL 5709197, at *3 (S.D. Cal. Sept. 24, 2020) ("regardless of which state's law applies"—Ohio, California, or Missouri—"the evidence establishes that an agreement to arbitrate exists").) The court agrees with Defendants that, regardless of which state's law applies, the evidence establishes an agreement to arbitrate. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("[The court] need not engage in this circular [choice of law] inquiry," where each state's law "dictate[s] the same outcome."). That said, the court applies New York law where possible.

## III. DISCUSSION

The question here is whether Plaintiffs and Defendants entered into a valid agreement to arbitrate. The answer turns on whether Plaintiffs had reasonable notice of the Cash App and Cash Card terms of service and unambiguously manifested assent to them. For the reasons that follow, the courts finds that the Cash App and Cash Card sign-up flow presented the terms in a clear and conspicuous manner; Plaintiffs were on inquiry notice of those terms; and Plaintiffs unambiguously manifested assent to them.

### A. Legal Standard

Arbitration is a creature of contract. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). The same principles that apply to paper contracts apply to smartphone-based contracts. *See id.* at 289; *Meyer*, 868 F.3d at 75. Thus, it remains "a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and a 'manifestation of mutual assent.'" *Starke*, 913 F.3d at 288 (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)). Equally fundamental, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Meyer*, 868 F.3d at 74.

Applying these principles to smartphone-based contracts, "an electronic 'click' can suffice to signify [] acceptance," but assent-by-click works only if "the layout and language of the [smartphone application] give the user *reasonable notice* that a click will manifest assent to an agreement." *Id.* at 75 (emphasis added). Accordingly, notice controls most smartphone-based agreements to arbitrate, and "[w]here an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to

them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289 (emphasis in original). "Whether a reasonably prudent user would be on inquiry notice turns on the clarity and conspicuousness of arbitration terms," where "clarity and conspicuousness are a function of the design and content of the relevant interface." *Meyer*, 868 F.3d at 75. The Second Circuit's decision in *Meyer* is instructive.

In *Meyer*, the court determined whether a user signing up for an Uber account was on inquiry notice of an arbitration provision contained in Uber's "Terms of Service," which were provided to the user via Uber's smartphone interface. *See id.* at 66. The "Terms of Service" were hyperlinked to the sign-up screen in an interface that looked like this:



The court found this interface provided reasonable notice of the contract terms contained in the "TERMS OF SERVICE & PRIVACY POLICY" hyperlink, because the hyperlink was clear and conspicuous. In reaching that conclusion, the court noted the following about the design of the screen and the language used:

- The payment screen was uncluttered with only fields for the user to enter his or her credit card details, buttons to register, and the warning that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Id.* at 78.

- The entire screen was visible at once. *Id.*

- The hyperlinks to the Terms and Conditions and Privacy Policy appeared directly below, *i.e.*, were "spatially coupled" with, the registration button. *Id.*

- The hyperlinks were "temporally coupled" with the registration button, *i.e.*, it was "provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply." *Id.*

- The language "[b]y creating an Uber account, you agree" was "a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms." *Id.* at 79.

Based on these factors, the court concluded that the Uber App's sign-up flow provided the user objectively reasonable notice of the terms contained in the "TERMS OF SERVICE" hyperlink. And, since a reasonable user would know that by clicking the registration button he or she was agreeing to the terms and conditions accessible via the hyperlink (regardless of whether the hyperlink was actually clicked), the user manifested assent, and the court compelled arbitration. *Id.* at 79-80.

As *Meyer* demonstrates, this is a "fact-intensive analysis," *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830 (S.D.N.Y. 2020), which considers the "totality of the circumstances," *Starke*, 913 F.3d at 297. Yet "only if the undisputed facts establish that there is reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms will [the court] find that a contract has been formed." *Meyer*, 868 F.3d at 75.

## B. Application

"[T]here are infinite ways to design a website or smartphone application." *Id.* Plaintiffs here encountered "sign-in-wrap" agreements. Best described as a cross between "clickwrap" and "browsewrap" agreements, these wraps "do not require the user to click on a box showing acceptance of the 'terms of use' in order to continue." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 366 n.1, 394 (E.D.N.Y. 2015); *see also Nicosia*, 384 F. Supp. 3d at 264-67 (describing such contracts as "hybridwrap" agreements, which "prompt the user to manifest assent to particular terms by engaging in some dual-purpose action, such as creating an account"). "Rather, the website [or smartphone application] is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's [or smartphone application's] sign-in or login process." *Berkson*, 97 F. Supp. 3d at 399.

No matter the terminology, though, the same fundamental elements of contract law apply. To determine whether Plaintiffs had reasonable notice of the terms of use and arbitration provision, and manifested assent to those terms, the court analyzes whether the Cash App and Cash Card sign-up flows put Plaintiffs on inquiry notice of the terms of service. Here, as in *Meyer*, inquiry notice depends on whether the design and content of those sign-up flows presented the hyperlinked terms of service in a clear and

conspicuous manner, such that plaintiffs unambiguously manifested assent to those terms.

1. Cash App

    *a.   Reasonable Notice*

Cash App subjected users to two different terms of service: the General Terms of Service and the Additional Cash Terms of Service. Inexplicably, though, the first set of user-facing hyperlinks connects to the *Additional* Cash Terms of Service (which does not contain the arbitration provision), rather than to the *General* Terms of Service (which does, and is available only through another hyperlink included in the Additional Cash Terms of Service). As a result, the following considers whether the Cash App sign-up flow provided clear and conspicuous notice of the hyperlinked terms of service to a reasonably prudent smartphone user at each stage—first to the existence of the terms of service (generally), then to the General Terms of Service and arbitration provision therein (specifically).

    b.   <u>Sign-Up Flow for Deeann Thorne</u>

Plaintiff Deeann Thorne downloaded Cash App, entered her phone number, and received a five-line text message with a six-digit sign-in code required to continue the registration process. This text message put Thorne on inquiry notice of the existence of the Cash App terms, because it presented the hyperlinked terms of service in a clear and conspicuous manner and at such a time that a reasonably prudent smartphone user could not avoid noticing them.

First, the message presented the hyperlinked terms on a single, uncluttered screen that warned, "By entering, you agree to the Terms, E-Sign Consent, and Privacy Policy:

https://squareup.com/legal/cash-ua."[11] *See Meyer*, 868 F.3d at 78-79 (holding that the Uber App's interface provided reasonable notice, in part, because the "[t]he entire screen [wa]s visible at once," "uncluttered," and contained similar "warning" language). Next, the underlined URL is unmistakably a hyperlink. *See id.* at 77-78; *Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197 (2d Cir. 2015) (noting that "underlining the URL" is "a manner distinctive to hyperlinks"). And the warning language that "[b]y entering, you agree" was a "clear prompt directing users to read the [hyperlinked terms of service] and signaling that" registering for Cash App "would [make one] subject to contractual terms." *See Meyer*, 868 F.3d at 78-79.

Finally, although notice of the Cash App terms was not "spatially coupled with the mechanism for manifesting assent," *i.e.*, entering the six-digit code in the "Confirmation Code" panel and clicking the "Next" button, it was temporally coupled. *See id.* at 80 (finding inquiry notice, in part, because notice was spatially and temporally coupled with the mechanism for manifesting assent); *cf. Starke*, 913 F.3d at 294 (explaining that post-sale terms provided via email—though "neither spatially nor temporally coupled with the transaction"—could still provide reasonable notice, if defendant provided those terms in "more conspicuous ways"). The Second Circuit has accorded "significant weight" to hyperlinked terms "temporally coupled with [a] register button," because (1) "that meant that the user could not avoid noticing the hyperlink when she registered for an account," and (2) "importantly, that also allowed the plaintiff 'to review the Terms of Service *prior to* registration.'" *Starke* 913 F.3d at 294 (discussing and quoting *Meyer*, 868 F.3d at 80) (emphasis in original).

---

[11] The text message also provided an option to "Tap to load preview" of that link, which, if tapped, provided "Terms of Service | Cash App" in bold font, followed by text, providing that "[t]he Cash App Terms of Service govern your use of Cash App. . . ." (Muller Decl. ¶ 22, Fig. 7.)

Here, notice of the Cash App terms of service is not presented with a "register" button, but it is presented "at a place and time that the consumer will associate with the initial [] enrollment," because that notice is provided prior to registration, in a text containing information integral to a successful Cash App registration, *i.e.*, the six-digit sign-in code. *See Meyer*, 868 F.3d at 78. Thorne "could not avoid noticing the hyperlink when she registered for an account," because she needed this six-digit sign-in code to successfully register for Cash App.[12] *See Starke* 913 F.3d at 294 (citing *Meyer*, 868 F.3d at 80). For that reason, the Cash App sign-up flow, like the sign-up flow in *Meyer*, provided notice of the terms of service "simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply," in a way that "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account." *See* 868 F.3d at 78. Accordingly, the Cash App sign-up flow put Thorne on inquiry notice of the terms of service.

    c.   <u>Sign-Up Flow for Flor Alonzo, Robin Clements, and Demetrius Lovett</u>

Plaintiffs Alonzo and Clements experienced the same text message interface as Thorne. Thus, as to them, the court reaches the same conclusion: the Cash App sign-up flow put them on inquiry notice of the terms of service.

Unlike his co-Plaintiffs, Lovett entered his email and received the six-digit code in a message with a clickable "Log In" button that warned, "By logging into Cash App, you agree to the <u>Terms of</u>

---

[12] The court is aware that smartphones can now offer the user the option to automatically fill-in an SMS sign-in code like the six-digit code here, without ever leaving the app. *See, e.g.*, Automatically fill in SMS passcodes on iPhone, iPhone User Guide, https://support.apple.com/guide/iphone/automatically-fill-in-sms-passcodes-iphc89a3a3af/ios. But Plaintiffs do not claim that happened here.

Service, E-Sign Consent, and Privacy Policy." Like his co-Plaintiffs, though, Lovett's email interface included all the same hallmarks of conspicuousness that put them on inquiry notice: the underlined text signified a hyperlink to a reasonable smartphone user; the familiar warning language prompted the user to read the hyperlinked terms; and the terms were temporally coupled with a successful Cash App registration. And because Lovett could either reenter the App to enter the six-digit sign-in code (like his co-Plaintiffs), or click the Log In button directly below that notice (which returned him to the App and automatically populated the confirmation code), his interface provided the added benefit of being spatially coupled with a mechanism to manifest assent, *i.e.*, clicking the Log In button. As a result, Lovett too was on inquiry notice of the terms of service.

The Cash App sign-up flow put Alonzo, Clements, and Lovett on inquiry notice of the terms of service two additional times throughout their registration. Once when they initially entered their phone or email (to receive the six-digit sign-in code) on a screen that warned, "By entering and tapping Next, you agree to the Terms"; and again (after entering the six-digit code) on a screen that requested the user's name and warned, "By continuing you agree to the Terms." Like the sign-up interfaces analyzed above, these notices rendered the terms of service conspicuous to a reasonable smartphone user because the hyperlinked terms appeared on an uncluttered screen, spatially and temporally coupled with a mechanism for manifesting assent, *i.e.*, the "Next" button, and successfully registering for Cash App. These additional notices provide independent bases to conclude that Cash App put Alonzo, Clements, and Lovett on inquiry notice of the terms of service.

d. Whether the Sign-Up Flow Presented the Hyperlinked General Terms of Service in a Reasonably Conspicuous Way

The court has found that the Cash App sign-up flow put Plaintiffs on inquiry notice of the first set of user-facing hyperlinks (the underlined URL, "Terms," and "Terms of Service"), thus putting them on inquiry notice of the terms of service generally. But the analysis does not end there. Because Cash App employed a multi-page sign-up flow that required the user to click two hyperlinks to reach the arbitration provision—first to the Additional Cash Terms of Service, then to the General Terms of Service (which contained the arbitration provision)—there remains the question of whether the Additional Cash Terms of Service called the reasonably prudent smartphone user's attention to the hyperlinked General Terms of Service. *See Starke*, 913 F.3d at 289 ("New York courts look to whether the term was obvious and whether it was called to the offeree's attention.").

Plaintiffs contend this multi-page sign-up flow rendered the General Terms of Service (and arbitration provision therein) inconspicuous, because the user must click through two hyperlinks to reach these terms. But it is well established that providing the relevant terms only by hyperlink "does not preclude a determination of reasonable notice." *See Meyer*, 868 F.3d at 78 (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) ("Clicking a hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket. In both cases, the consumer is prompted to examine terms of sale that are located somewhere else.")). This is true whether the sign-up flow requires the user to click through one or multiple hyperlinks to reach the specific terms containing the arbitration provision. *See, e.g.*, *Nicosia*, 384 F. Supp. 3d at 260-61, 269-270; *Hidalgo v. Amateur Athletic Union of United States, Inc.*, 468 F. Supp. 3d 646, 659 (S.D.N.Y. 2020).

Defendants rely primarily on *Hidalgo*. There, plaintiff argued that he lacked notice of the arbitration provision, because it was "hidden" in the middle of the roughly 170-page Code Book accessible through hyperlinks. *See Hidalgo*, 468 F. Supp. at 659. The court rejected that argument, holding that "the fact that an applican . . . was required to click through multiple hyperlinks . . . to reach . . . . the specific part of the [] Code Book containing the arbitration provision [did] not mean that the plaintiff cannot be bound by the arbitration provision because 'clicking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket'" in *Carnival Cruise Lines*. *Id.* Unlike *Hidalgo*, which considered a single set of terms navigable by hyperlinks, this case considers two sets of terms. But this distinction does not render the incorporated terms automatically inconspicuous as Plaintiffs contend.[13] In each case, the touchstone of the inquiry-notice analysis remains the same: "As long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms." *Meyer*, 868 F.3d at 79.

With that principle in mind, the court considers whether the Additional Cash Terms of Service presented the hyperlinked text connecting to the General Terms of Service in a clear and conspicuous way, such that Plaintiffs were on inquiry notice of the General Terms of Service and arbitration provision therein. In doing so, the court analyzes the Additional Cash Terms of Service presented to Alonzo, Clements, and Lovett (in 2020), rather than Thorne (in 2017), because those terms present another issue. Specifically, Plaintiffs contend the 2020 Additional Terms generate a separate barrier to reasonable notice, because although it

---

[13] Indeed, the court finds the two relatively user-friendly sets of Cash App terms, a combined roughly 51 pages, far less imposing than an impenetrable, 170-page Code Book.

began with the heading titled, "Additional Cash Terms of Service," the first sub-heading that followed was titled, "General Terms of Service," and, the first paragraph of that sub-heading included a hyperlink repeating that title, "General Terms of Service."

Plaintiffs contend this repetitive "General Terms of Service" rendered the terms inconspicuous because a reasonably prudent smartphone user would not think to click a General Terms of Service hyperlink, within a sub-heading bearing the same name, contained in a page titled *Additional* Cash Terms of Service. Defendants describe this argument as "specious," yet offer little more than to repeat the refrain that hyperlinks represent the twenty-first century equivalent to turning over the Carnival Cruise ticket. But Defendants miss the point of that vivid analogy. Hyperlinks do not provide an incorporation-by-reference cure-all. Rather, hyperlinks equate to the simple act of turning over the cruise ticket, thereby placing the offeree on constructive notice, only when the hyperlinked text itself is reasonably conspicuous. *See Starke*, 913 F.3d at 294; *Meyer*, 868 F.3d at 79.

Notwithstanding the inverted headings, the Additional Cash Terms of Service presented to Alonzo, Clements, and Lovett sufficiently put them on inquiry notice of the hyperlinked General Terms of Service, because the hyperlinked text was reasonably conspicuous and the surrounding language clearly prompted the user to click and read those terms. The first paragraph within the General Terms of Service sub-heading provided, "These Additional Cash App Terms of Service (the 'Cash Terms') govern your use of Cash App . . . . By using the Service you agree to be bound by these Cash Terms, the E-Sign Consent, and the General Terms of Service," where "E-Sign Consent" and "General Terms of Service" are produced in a bright green text. This language plainly advises the user that he is agreeing not only to *these terms* (*i.e.*, the Additional Cash Terms of Service), but also to the General

Terms of Service. And that familiar cautionary language coupled with specific, often hyperlinked terms produced in a bright green text (*i.e.*, "General Terms of Service") signified to a reasonably prudent smartphone user that General Terms of Service is a hyperlink. *See Meyer*, 868 F.3d at 77-78; *Fteja*, 841 F. Supp. 2d at 835 (finding that the underlined phrase "Terms of Service" signified a hyperlink, because it is "a phrase that is usually highlighted or underlined and sends users who click on it directly to a new location"). Finally, the warning, "By using the Service you agree to the be bound," is a clear prompt directing users to read the General Terms of Service to which they are agreeing. *See Meyer*, 868 F.3d at 79.

The combined effect of these facts establishes that the hyperlinked General Terms of Service was reasonably conspicuous, thus placing Alonzo, Clements, and Lovett on constructive notice of those terms.[14] With that conclusion, the court easily finds that Thorne too was on notice of the General Terms of Service. Her Additional Cash Terms presented the same language and hyperlinks, but without the duplicative headings, and with the hyperlinked terms in blue—and bold—text.

Whether Plaintiffs "bother[ed] to read[] the additional terms" is of no moment; "the user is still on inquiry notice." *Meyer*, 868 F.3d at 79; *see also Starke*, 913 F.3d at 295 (explaining that an offeree has a duty to read contract terms, as long as the offeree is put on notice of the existence of those contract terms). Had they clicked the General Terms of Service link as prompted, though, each would have read (in the first paragraph) about the

---

[14] As the foregoing makes clear, Defendants' provision of the Additional Terms before the General Terms, and the transposed headings therein, is far from a model of clarity. Still, the totality of the circumstances here provided sufficient notice to a reasonable user. In a different case, however, this presentation could easily obscure that notice. Defendants would be well advised to improve its sign-up flow and avoid such needless confusion.

binding arbitration provision therein: "By using any of the Services you agree to these General Terms and any policies referenced within [], including terms that . . . require individual arbitration for any potential legal dispute (see Section 21)." Section 21, found later in the consecutively numbered sections of the roughly 17-page contract, is titled "Binding Individual Arbitration."

Accordingly, a reasonable smartphone user would be on inquiry notice as to the Cash App General Terms of Service and arbitration provision therein, because the Cash App sign-up flow presented those terms in a clear and conspicuous way.

### e. Manifestation of Assent

In determining whether Plaintiffs manifested assent to the General Terms of Service and arbitration provision therein, *Meyer* is again instructive. There, the Second Circuit found that "[a]lthough Meyer's assent to arbitration was not express, . . . it was unambiguous in light the objectively reasonable notice of the terms." *Meyer*, 868 F.3d at 79. So too here. Cash App's sign-up flow provided clear and conspicuous notice to Plaintiffs and prompted them to take affirmative action to demonstrate assent. Therefore, Plaintiffs assented to the Cash App terms of service.

The notice-giving text message that Thorne received provided: "Cash App: 970-832 is your sign in code. By entering, you agree to the Terms, E-Sign Consent, and Privacy Policy: https://squareup.com/legal/cash-us." As described above, there is ample evidence that a reasonable user would be on inquiry notice of these terms. And although notice was not spatially coupled with the mechanism for manifesting assent, *i.e.*, entering the six-digit code, it was temporally coupled. Once Thorne received this six-digit sign-in code, she needed to return to Cash App to enter the code and continue her registration. Cash App then directed Thorne to "Please enter the code sent to [her phone

number]" in a blank "Confirmation Code" panel. By entering that code, Thorne, as warned by the cautionary language contained in her text, manifested assent to those terms.

A reasonable user would know that by entering the six-digit sign-in code and completing her Cash App registration, she was agreeing to the terms and conditions accessible via the hyperlink, whether she clicked on the hyperlink or not. *See Meyer*, 868 F.3d at 80. The fact that entering the sign-in code had two functions (notification and security verification) did not render assent ambiguous. *See id.*; *see also Nicosia*, 384 F. Supp. 3d at 266-68. Thorne could review the terms prior to registration, and the dual-function of the sign-in code was made clear in the cautionary language. Finally, like *Meyer*, "[t]he transactional context of the parties' dealings"—Thorne's enrollment and use of Cash App's services—reinforces the court's conclusion: Thorne manifested assent to the Cash App terms of service. *See id.*

So too did Alonzo, Clements, and Lovett. As described above, Cash App presented notice of the terms in a clear and conspicuous way to these Plaintiffs three separate times throughout their enrollment. Two of those instances provided the familiar warning language and terms of service in a clear and conspicuous way, coupled spatially and temporally with the mechanism for manifesting assent to those terms, *i.e.*, the "Next" button. Those interfaces are like the Uber interface in *Meyer*, and, as the Second Circuit did there, the court finds that Alonzo, Clements, and Lovett manifested assent when they clicked the "Next" button to continue and complete their Cash App registration. *See* 868 F.3d at 79-80. Moreover, Alonzo and Clements received the same text message

containing the six-digit sign-code as Thorne and, like Thorne, manifested assent by reentering Cash App and entering that code.[15]

Cash App's sign-up flow put Plaintiffs on inquiry notice of the Cash App terms of service, and they unambiguously manifested assent to those terms. For those reasons, Plaintiffs and Defendant Square entered into an agreement to arbitrate.

### 2. Cash Card

Following the Cash App interface analysis, the court has little trouble in finding that the design and content of the Cash Card sign-up flow put Plaintiffs on inquiry notice of the Cash Card terms of service, such that they unambiguously manifested assent to the terms. And Plaintiffs make no argument to the contrary. The design and content of the Cash Card sign-up screens provided to Thorne, and to Alonzo, Clements, and Lovett, respectively, all included the hallmarks of inquiry notice: the interfaces were uncluttered; the notice had the familiar warning language, "By continuing you agree to the Terms & Privacy Policy"; the hyperlinked text was clear and conspicuous; the notice was spatially and temporally coupled with a "Continue" button (*i.e.*, the mechanism for requesting the Cash Card and manifesting assent); and that conspicuous hyperlinked text took the user to the Cash Card terms of service that contained the applicable arbitration provision.

---

[15] Lovett, on the other hand, received his code via email, which provided a clickable "Log In" button below the following notice with underlined, clickable hyperlinks: "By logging into Cash App, you agree to the Terms of Service, E-Sign Consent, and Privacy Policy." Clicking that Log In button would demonstrate sufficient conduct to manifest assent. However, because Lovett had the option to either press the Log In button to enter the sign-in code, or reenter Cash App and enter that code, the court cannot say whether he did, in fact, press "Log In" and manifest assent by that conduct.

Plaintiffs make no argument that the Cash Card interface rendered the terms inconspicuous; rather, they argue that the Cash Card sign-up flow failed to notify the user that (1) Cash Card is a different product offered by another entity, or (2) Cash Card offered terms different from Cash App. These arguments are without merit. Plaintiffs, although using Cash App, were entering a new transaction by requesting a Cash Card. During that process, Cash App put Plaintiffs on inquiry notice of another set of terms attached to that request. And that notice provided a clear prompt directing the user to read the hyperlinked terms of service. Whether they read them is irrelevant. If they had, though, they would have viewed the following in the first paragraph of the first section of the Cash Card terms of service:

> This Cash App Prepaid Card Program Agreement (this "Agreement") represents an agreement between you and Sutton Bank, member FDIC (the "Bank"), and outlines the terms and conditions governing Cash App Prepaid Program (the "Program"). This Agreement supplements but does not replace the Square Terms of Service.

These terms make clear that Cash Card presented a different product, with different terms, with a different entity. Accordingly, the court finds Plaintiffs were on inquiry notice of the Cash Card terms of service, and because each Plaintiff pressed "Continue," and successfully ordered a Cash Card, each Plaintiff unambiguously manifested assent to those terms. For those reasons, Plaintiffs and Defendant Sutton Bank entered into an agreement to arbitrate.

### C. The Parties Delegated Questions of Arbitrability to the Arbitrator

Parties can agree to delegate the threshold question of arbitrability to an arbitrator in addition to underlying merits disputes. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). The Second Circuit has found even broad language

regarding the scope of an arbitration agreement to be a clear and unmistakable agreement to delegate questions of enforceability to an arbitrator. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("The words 'any and all' are elastic enough to encompass disputes over whether a claim is . . . within the scope of arbitration.").

Here, all Plaintiffs agreed to broad delegation provisions. At all relevant times, Cash App presented the following terms (for all Plaintiffs). Section 21 provided that "You and Square agree to arbitrate any and all Disputes by a neutral arbitrator who has the power to award the same damages and relief that a court can," where "Dispute" is defined as "any claim, controversy, or dispute between you and Square, . . . including any claims relating in any way to these Terms or the Services, or any other aspect of our relationship," *see PaineWebber Inc.*, 81 F.3d at 1199 (finding that the parties agreed to arbitrate gateway questions of arbitrability, because "the meaning of the first [provision in the agreement] [wa]s 'plain indeed'": "[A]ny and all controversies . . . concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement . . . shall be determined by arbitration. . . ."). Section 21 further provided that "All Disputes will be resolved . . . by binding individual arbitration," and that "[t]he Federal Arbitration Act, 9 U.S.C. §§ 1-16, fully applies." (Ex. A to Muller Decl., 2016-2018 General Terms of Service at 12-13; Ex. F to Muller Decl., 2019-2020 General Terms of Service at 13.) The terms presented to Alonzo, Clements, and Lovett added that "[t]he Arbitrator shall be responsible for determining all threshold arbitrability issues." (Ex. F to Muller Decl., 2019-2020 General Terms of Service at 13.)

Cash Card provided equally broad terms to all Plaintiffs:

> For any and all controversies, disputes, demands, claims, or causes of action between you and us (including the interpretation and scope of this Section and the arbitrability of the

controversy, dispute, demand, claim, or cause of action) re-
lating to the Cards, the Card Accounts, or this
Agreement . . . , you and we agree to resolve any such con-
troversy, dispute, demand, claim, or cause of action
exclusively through binding and confidential arbitration.

(*See* Exs. G, I to Wu Decl., 2017 and 2020 Cash Card Terms of
Service.)

The Cash App and Cash Card arbitration provisions that Plaintiffs
agreed to with Defendants serve as clear and unmistakable evi-
dence of the parties' intent to delegate the threshold question of
arbitrability to an arbitrator. In light of this broad delegation, any
question of arbitrability is properly submitted to the arbitrator.
*See Henry Schein, Inc.*, 139 S. Ct. at 529.

## IV. CONCLUSION

Defendants' (Dkt. 35) motion to compel is GRANTED and, be-
cause all questions of arbitrability are submitted to the arbitrator,
the action is DISMISSED with prejudice. The Clerk of the Court
is respectfully DIRECTED to enter judgment for Defendants and
close the case.

SO ORDERED.

Dated:     Brooklyn, New York
           February 23, 2022

                                         /s/ Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge